2006 VT 53

## State of Vermont v. Michael Perez

[912 A.2d 944]

No. 05-045

Present: **Reiber, C.J., Dooley, Johnson and Skoglund, JJ., and Kupersmith, D.J., Specially Assigned**

Opinion Filed June 16, 2006

Motion for Reargument Denied October 16, 2006

*Dan M. Davis*, Windham County State's Attorney, and *Tracy Kelly Shriver*, Deputy State's Attorney, Brattleboro, for Plaintiff-Appellee.

*Allison N. Fulcher* and *Erika Wright*, Law Clerk (On the Brief), of *Martin & Associates*, Barre, for Defendant-Appellant.

¶ 1. **Skoglund, J.** Defendant Michael Perez appeals from his conviction, after a jury trial, of aiding in aggravated murder in violation of 13 V.S.A. §§ 3, 2301, 2311(a). He argues that: (1) the trial court erred in refusing to instruct the jury on a lesser-included offense of voluntary manslaughter; (2) the court's instruction on accomplice liability was inadequate and misleading; (3) there was insufficient evidence to support his conviction; (4) the court erred in denying his motion for individual and sequestered voir dire; and (5) the court erred by failing to sequester the jury during deliberations. We affirm.

¶ 2. The record reveals the following. In July 2002, defendant was charged with aiding in aggravated murder based on information that he aided in the intentional killing of Gregg Enos and Colleen Davis. The victims' bodies were discovered on June 25, 2002, in Enos's pickup truck in the Mollie Beattie State Forest in Grafton, Vermont. Enos died from multiple stab wounds to his head and torso. His body was found upside down on the driver's side of the truck, under the steering wheel. Davis was found partially inside the cab of the truck, bent somewhat at the waist through a small window in the back of the cab. Her upper torso and head were resting on a tire in the open, back part of the truck. She died from blunt trauma to the head.

¶ 3. At the scene, police found a long tree limb with a piece of red cloth wrapped around its end, resting on the back of Davis's skull. The cloth was burnt, and it contained Enos's blood. Another piece of burnt red cloth, also containing Enos's blood, was found protruding from the truck's gas tank. Both pieces of cloth were part of a red "Fat Albert" t-shirt that defendant had been observed wearing on the day of the murders. Police also discovered a rock with Davis's blood on it near a picnic table at the campsite.

¶ 4. Police encountered defendant and Charles Sherman at the murder scene the day the bodies were discovered. Defendant, who is black, was twenty years old at the time of the murders, and he was

living with the Sherman family. Sherman, who is white, was in his early forties. Defendant told police that he and Sherman wanted to retrieve their truck, which had gotten stuck in the state forest the previous evening. Defendant initially stated that he and Sherman had walked home after their truck got stuck. He later said that he and Sherman caught a ride to Bellows Falls in a dark brown or black pickup truck.

¶ 5. Defendant gave another statement to police later that evening. He reiterated that he and Sherman caught a ride in a pickup truck. He denied any involvement in the murders. Defendant told police that after catching a ride into Bellows Falls, he and Sherman got drunk and went to sleep. He said that on the day of the murders, Sherman wore a red shirt, while he wore a white one. He denied that he and Sherman had a knife in their truck that day, despite testimony from several witnesses to the contrary.

¶ 6. Several days later, defendant told police that Sherman killed both victims. He recounted the following story. He and Sherman were very intoxicated. They went joyriding in the state forest until their truck got stuck. They started walking back to Bellows Falls and caught a ride with Enos and Davis. After stopping to buy beer and snacks, they all decided to return to the state forest to party. At some point, Enos and Sherman left the campsite to look at the stuck truck, and defendant had consensual sex with Davis on the picnic table. Enos and Sherman returned while this was occurring, which angered Enos. Defendant calmed things down, and the group started drinking together again. When Enos and Davis got ready to leave, Enos made a parting comment to defendant, calling him a "nigger." This angered Sherman, who began arguing with Enos. Defendant described himself as "frozen."

¶ 7. According to defendant, Sherman grabbed a stick out of defendant's hands and hit Enos with it. Sherman then tried to move Enos's body and asked defendant for help. Enos sprang up and ran to the truck. Sherman chased Enos and stabbed him. Defendant did not know that Sherman had a knife.

¶ 8. Eventually, Sherman, defendant, and Davis went to Enos's truck. The truck was too bloody to drive. Sherman asked defendant to help him move Enos's body into the truck. Sherman then told Davis to get into the truck, which she did. She tried to climb out of the truck's back window, and Sherman hit her with a stick and a beer bottle while defendant left and went inside a camp building at the site. Sherman later came into the camp building, threw his shirt and

keys into the fire, and told defendant to wrap his shirt around the tree limb and light it. Sherman lit the shirt, stuck it into the truck, and the two men left the scene.

¶ 9. After giving this statement, defendant led police to evidence that he and Sherman had discarded. En route, he repeated portions of his story. He reiterated that Sherman became angry when Enos used a racial slur, and he stated that Sherman responded by saying "that's my nigger, not yours." Defendant indicated that he was scared Sherman would kill him. He told police that he and Sherman filled their clothes and shoes with rocks and threw them into the river. He also stated that they had planned to go to the state forest the following day, remove the tree limb, and pretend to discover the bodies. Defendant repeated that Sherman was very drunk that day and falling down due to his intoxicated state.

¶ 10. Several days after giving the first statement, defendant provided police with a slightly different version of events. Contrary to his initial story, defendant said that Sherman told him to hit Davis with the tree limb, which he pretended to do.

¶ 11. Defendant testified on his own behalf at trial, recounting another slightly different version of events. The State introduced defendant's various statements to police, in addition to other evidence. Several witnesses also testified that defendant told them that he raped Davis before killing her and that he "beat the dude and stabbed the bitch fifty-seven times." The jury found defendant guilty of aiding in aggravated murder, and this appeal followed.

¶ 12. Defendant first argues that the jury should have been instructed on a lesser-included offense of voluntary manslaughter. According to defendant, ample evidence supported his assertion that the killings were prompted by Enos's use of a racial slur. Defendant maintains that, based on the evidence, the jury could have determined that Sherman got violent and aggressive when he drank, Sherman and defendant had been drinking most of the day, Sherman was upset when Enos called defendant a "nigger," and, in a drunken rage, Sherman lost control and attacked and killed Enos. Defendant also points to the existence of a "sloppy" crime scene as evidence that the murders were the result of sudden provocation.

¶ 13. Assuming for present purposes that voluntary manslaughter, or "aiding in voluntary manslaughter," can be a lesser-included offense of aiding in aggravated murder, we find no error in the trial court's refusal to instruct the jury on this offense. While it is true that, "[a]s a general rule, a criminal defendant is entitled to have

the jury instructed on all lesser-included offenses," the instruction need be given only "if the facts in evidence reasonably support such an instruction." *State v. Delisle*, 162 Vt. 293, 301, 648 A.2d 632, 637 (1994). The facts do not reasonably support a voluntary manslaughter instruction here.

¶ 14. Voluntary manslaughter has four elements: (1) adequate provocation; (2) inadequate time to regain self-control or "cool off"; (3) actual provocation; and (4) actual failure to "cool off." *State v. Turgeon*, 165 Vt. 28, 32, 676 A.2d 339, 342 (1996) (quoting 2 W. LaFave & A. Scott, Substantive Criminal Law § 7.10, at 255 (1986)). The only evidence of provocation in this case was defendant's testimony that Sherman became angry when Enos directed a racial slur toward defendant. Putting aside the oddities in defendant's story — including the fact that, according to defendant, Sherman responded by using the same slur — the alleged insult was insufficient as a matter of law to establish provocation. See *State v. Bogie*, 125 Vt. 414, 417, 217 A.2d 51, 55 (1966) (recognizing that "provocation by mere words will not justify a physical attack"). There was no other evidence to support the use of a voluntary manslaughter instruction. The existence of a "sloppy" murder scene in no way tends to reasonably show that the murders were provoked. Because no reasonable construction of the facts establishes the offense of voluntary manslaughter, the trial court did not err in refusing to provide this instruction to the jury. See *Turgeon*, 165 Vt. at 33, 676 A.2d at 342 ("The trial court need only instruct the jury on the elements of lesser-included offenses that are fairly raised; it need not charge on a theory not supported by the evidence.").

¶ 15. Defendant next argues that the trial court's charge to the jury, read as a whole, was inadequate and misleading. He maintains that a fair and reasonable interpretation of the overall charge on accomplice liability allowed the jury to find him guilty of aiding in aggravated murder even if it found that he and Sherman had entered into an agreement with the intent to kill only one of the victims and not the other.

¶ 16. On appeal, we view the jury instructions in their entirety, and we "will reverse only when the entire charge undermines confidence in the verdict." *State v. Brown*, 2005 VT 104, ¶ 43, 179 Vt. 22, 890 A.2d 79 (quotation omitted). We must determine if "the instructions taken as a whole breathe the true spirit of the law, such that the jury has not been misled." *State v. Dann*, 167 Vt. 119, 132, 702 A.2d 105,

113 (1997). There is no support for defendant's assertion that the jury instructions were misleading here.

■■ ¶ 17. To establish defendant's guilt of aiding in aggravated murder, the State needed to prove that defendant aided Sherman in the commission of each murder and had the requisite intent with respect to each murder. 13 V.S.A. §§ 3, 2301, 2311(a). The jury instructions accurately and clearly described the State's burden of proof. They explained the elements of the crime with which defendant was charged, and stated that to prove defendant's guilt as an accomplice, the State needed to show that defendant and Sherman acted under a common plan. The court then provided an in-depth explanation of what was required to establish a "common plan," including the requirement that defendant share Sherman's intent to commit all of the legal elements of the offense, which the court set out. The instructions plainly informed the jury that to find defendant guilty, it needed to find that he aided Sherman in each of the murders. Defendant fails to identify any specific language in the instructions that was misleading or confusing, and we find no error.

¶ 18. Defendant next argues that the trial court erred in denying his motion for a judgment of acquittal. According to defendant, the State failed to produce sufficient evidence to prove that he and Sherman entered into an agreement to kill both victims and that he shared in Sherman's intent to kill both victims. Defendant maintains that even if the jury found his various statements to police not credible, its disbelief of these statements does not establish that he joined in an agreement or shared in the intent to kill.

¶ 19. We reject this argument. As previously articulated, we review the denial of a V.R.Cr.P. 29 motion for judgment of acquittal to see "whether the evidence, when viewed in the light most favorable to the State and excluding any modifying evidence, fairly and reasonably tends to convince a reasonable trier of fact that the defendant is guilty beyond a reasonable doubt." *Delisle*, 162 Vt. at 307, 648 A.2d at 641 (quotation and brackets omitted). There was ample evidence in this case to establish defendant's guilt.

¶ 20. As previously stated, the State needed to prove that defendant aided Sherman in the commission of each murder and that he had the requisite intent with respect to each murder. 13 V.S.A. §§ 3, 2301, 2311(a). The record shows that defendant admitted being present at the murder scene, helping to move Enos's body, and disposing of incriminating evidence. He lied to police, and he provided varying accounts of the evening's events. A piece of a shirt that defendant

was seen wearing was wrapped around the tree limb found resting on Davis's skull; another piece of his shirt was found protruding from the gas tank of Enos's truck. Both contained Enos's blood. A rock with Davis's blood was found near the picnic table where defendant claimed to have had consensual sex with the victim.

¶ 21. In his conversations with police, defendant attempted to assign all responsibility for the murders to Sherman, whom he had previously described as falling-down drunk. Defendant maintained that Sherman, despite his intoxicated state, had been able to subdue and brutally murder the two young victims, in the dark of night, completely on his own. The jury was free to reject this story, and it could reasonably infer from the totality of the evidence presented at trial that defendant assisted Sherman in murdering both victims. See *State v. Miller*, 146 Vt. 164, 169, 502 A.2d 832, 835 (1985) (holding that a reasonable jury could conclude beyond a reasonable doubt that defendant was guilty of participating in common plan to murder another based on evidence of defendant's companionship with coconspirator, their presence at the scene with the victim shortly before the crime, the injuries suffered by the victim, other evidence from the crime scene, and defendant's actions before and after the crime); see also *State v. Durenleau*, 163 Vt. 8, 12, 652 A.2d 981, 983 (1994) ("In assessing circumstantial evidence, the fact-finder may draw rational inferences to determine whether disputed ultimate facts occurred."); *State v. Camley*, 140 Vt. 483, 489, 438 A.2d 1131, 1134 (1981) ("The jury has the right to believe all, part, or none of the testimony of any witness, and this rule applies to the defendant as well as any other witness."). Defendant's motion for a judgment of acquittal was properly denied.

¶ 22. Defendant next argues that the trial court erred in denying his motion for individual and sequestered voir dire. He maintains that he was entitled to this procedure because he was charged with a violent crime, and his race differed from that of the victims. According to defendant, the trial court unreasonably and improperly limited the examination of prospective jurors, despite the significant possibility of racial bias.

¶ 23. The trial court denied defendant's request for individual and sequestered voir dire after concluding that the process posed significant problems that counterbalanced its arguable merits. The court ultimately provided jurors with a written questionnaire, at defendant's suggestion, that was designed to elicit jurors' potential racial or ethnic biases. See V.R.Cr.P. 24(a) (explaining that trial court

may distribute written questionnaires to prospective jurors to assist the voir dire examination). The subject of racism was also discussed by the State during voir dire, and two jurors were excused for cause.

■ ¶ 24. We find no error in the procedure employed by the trial court. See *State v. Bernier*, 157 Vt. 265, 267, 597 A.2d 789, 790 (1991) ("The nature and scope of voir dire is within the sound discretion of the trial court, and decisions regarding voir dire will be reversed only where the court abuses its discretion."). Contrary to defendant's suggestion and the out-of-state cases on which he relies, the trial court did not unfairly restrict his ability to inquire into possible bias during voir dire. Instead, the record demonstrates that the trial court was mindful of the possibility of racial or ethnic bias, and it took appropriate steps to identify any potential prejudices that the prospective jurors might have possessed. Cf. *Rosales-Lopez v. United States*, 451 U.S. 182, 192 (1981) (plurality opinion) (stating that federal trial courts must inquire into racial and ethnic prejudice of prospective jurors when requested by a defendant accused of a violent crime, and where the defendant and the victim are members of different racial or ethnic groups). We find no abuse of discretion.

¶ 25. Finally, defendant argues that the trial court erred by failing to sequester the jury during deliberations despite a request from both sides that it do so. He suggests that there was a real possibility that the deliberative process could have been tainted as a result.

¶ 26. The record shows that at trial defendant argued that allowing the jury to separate would adversely affect the deliberative process, specifically, the group decision-making process. He did not suggest that there was any possibility that the jurors would be exposed to prejudicial information or that they would fail to heed the court's cautionary instructions. The trial court denied the request, noting that there had been no request to sequester the jury during trial and it was difficult to discern why the jurors should be deemed less trustworthy during the deliberation phase. The court found that the jury would follow its instructions, and it rejected defendant's assertion that allowing them to separate would adversely affect the deliberative process. Instead, the court concluded that allowing the jurors to separate during deliberations would make them more effective jurors. The record indicates that the jury separated overnight and returned their verdict the following day.

■■ ¶ 27. We find no error in the trial court's denial of defendant's sequestration request. The trial court has discretion in deciding

whether to allow the jury to separate. V.R.Cr.P. 23(d); see also Reporter's Notes, V.R.Cr.P. 23(d) (recognizing that Rule 23(d) adopts recommendation of American Bar Association that "jury separation be within the discretion of the trial court and that sequestration be used only when highly prejudicial matters are likely to come to the jury's attention"). Defendant bears the burden of showing an abuse of discretion. *State v. Brisson*, 124 Vt. 211, 215, 201 A.2d 881, 883 (1964). To meet this burden, he must show more than the mere existence of circumstances capable of prejudicing the jury. *State v. Brooks*, 163 Vt. 245, 258, 658 A.2d 22, 31 (1995). He must "demonstrate a nexus between the events or circumstances and juror taint." *Id.*; see also *State v. Dragon*, 135 Vt. 168, 170, 376 A.2d 12, 13-14 (1977) (requiring a demonstrable showing of prejudice, and stating that mere speculation of juror prejudice is insufficient). Defendant makes no such showing here. His generalized assertion about the necessity of preserving group dynamics during the jury's deliberations does not suffice to demonstrate prejudice. Indeed, accepting this argument would preclude the trial court from ever allowing a jury to separate during deliberations, which contravenes Rule 23(d). We find no abuse of discretion.

¶ 28. In light of our discussion above, we need not address defendant's argument that he was denied a fair trial by the cumulative and combined effects of the errors that he alleged on appeal.

*Affirmed.*