2008 VT 67

### State of Vermont v. Robert P. Jones, Jr.

[955 A.2d 1190]

No. 06-219

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed May 16, 2008

152

Thomas Donovan, Jr., Chittenden County State's Attorney, and *Pamela Hall Johnson*, Deputy State's Attorney, Burlington, for Plaintiff-Appellee.

*Allison N. Fulcher* of *Martin & Associates*, Barre, for Defendant-Appellant.

¶ 1. **Johnson, J.** Defendant Robert Jones appeals his jury convictions of second-degree murder and domestic assault of his eleven-year partner, Sarah Genest. Defendant claims that the district court committed reversible error by: (1) allowing the State to present prior-bad-act evidence at trial; (2) denying his motion for judgment of acquittal based on the insufficiency of the evidence; (3) instructing the jury in a manner that directed the verdict for the State on the murder charge; and (4) failing to submit special jury verdict questions at defendant's request. We affirm.

¶ 2. The evidence presented at trial was substantially as follows. In May 2003, defendant and Sarah Genest were living together in a Burlington apartment with their two minor children. On the afternoon of May 4, 2003, Ms. Genest met a friend at Pearl Street Beverage in Burlington, and thereafter they walked together to the home of defendant's mother, where defendant and the couple's daughter were eating dinner. Defendant later drove Ms. Genest and her friend home to the couple's apartment, where the adults sat together and drank beer. A little before 10:00 p.m., Ms. Genest and her friend went out to purchase more beer at a local store. On the way back from the store, they stopped at a bar, had a drink, and returned to the couple's home.

¶ 3. Shortly after they returned to the apartment, defendant began arguing with Ms. Genest about her detour to the bar and pushed her in the chest with both hands, knocking her to the ground. The friend helped Ms. Genest to her feet, but left soon afterward, at approximately 10:30 p.m. Ms. Genest's friend later

testified that at the time she left the couple's apartment Ms. Genest was intoxicated but had not been in any fights, other than being pushed by defendant, and showed no visible signs of injury.

¶ 4. The following day, around 2:00 p.m., defendant called his girlfriend, Melissa Bolsta, and asked her to come over because he was having difficulty waking Ms. Genest. When Ms. Bolsta arrived at the apartment, she found Ms. Genest lying in her bed with what appeared to be a black eye and red marks on her upper chest and breathing that sounded raspy and gurgly. Ms. Bolsta asked defendant if he had hit Ms. Genest, and he admitted to hitting her on the chest. Defendant initially resisted Ms. Bolsta's suggestion that they take the comatose Ms. Genest to the hospital, indicating concern over what hospital personnel might think about the bruises evident on her body. Eventually, Ms. Bolsta persuaded defendant, and after carrying Ms. Genest out to the car, they drove her to Fletcher Allen Health Care at about 2:45 p.m.

¶ 5. Ms. Genest remained unconscious when they arrived at the hospital, and defendant placed her in a wheel chair with the assistance of the hospital security guard. At the hospital, defendant first communicated with an Emergency Department nurse about Ms. Genest's condition. He told the nurse that Ms. Genest had been in Montreal the night before, that she had been in some kind of altercation, and that he could not wake her in the morning.

¶ 6. The medical director of the Emergency Department examined Ms. Genest shortly after her arrival. She found Ms. Genest in a comatose state, and noted several bruises on her chest wall, her lower neck and face, and her legs. The doctor's primary concern was to protect Ms. Genest's airway, and when medical personnel suctioned her airway, they found what appeared to be stomach contents in her trachea. According to the doctor, defendant told her that Ms. Genest had been out with a friend the night before, that she might have been in a fight or overdosed on Klonopin, and that she had vomited twice that morning.

¶ 7. A neurosurgeon also examined Ms. Genest in the Emergency Department. During the examination, he noticed bruising of various ages on her head, chest, arms, and legs. Defendant told him that Ms. Genest had been out drinking with a friend the night before, that they had some type of argument, and that he found her passed out in the bathroom, at which point he put her

to bed. According to defendant, Ms. Genest's condition was drug or alcohol-related and not related to trauma. The neurosurgeon, however, found the CAT scan results — showing that Ms. Genest had a subdural hematoma, or bleeding between the skull and brain — and the various bruises on her body inconsistent with defendant's story.

¶ 8. Ms. Genest died at the hospital on May 8, 2003, after being removed from life support. The medical examiner determined that Ms. Genest had been beaten and that the cause of death was blunt-impact injuries to her head. He found that Ms. Genest had five such injuries to the head that were consistent with having been inflicted within seventy-two to ninety-six hours of the autopsy. He identified that she had twelve nondisplaced fractured ribs and suffered separate impact injuries on her face, chest, torso, arms, and legs. It was his opinion that Ms. Genest's injuries could not have been sustained from a fall because there were too many bodily planes involved. Both the medical examiner and the neurologist who assisted him in examining Ms. Genest's brain concluded that blunt force to the head caused her brain to swell, which compressed her brain stem and led to disrupted cardiac and respiratory function, resulting in death.

¶ 9. In June 2003, defendant was charged with the second-degree murder and second-degree aggravated assault of Ms. Genest. In December 2004, the State gave notice of its intent to admit prior-bad-act evidence at trial pursuant to Vermont Rule of Evidence 404(b), to show the nature of defendant's abusive relationship with Ms. Genest and the absence of accident with respect to Ms. Genest's death. Defendant moved to exclude the evidence, arguing that it was inadmissible hearsay, that it violated the Confrontation Clause, and that it was inadmissible under Rule 404(b) because it was not "signature" evidence. On September 8, 2005, the court held an evidentiary hearing on the motion in limine to exclude the prior-bad-act evidence, at which the State proferred ten witnesses and played two 911 calls made by Ms. Genest that it believed tended to establish a pattern of abuse by defendant against Ms. Genest. The court granted, in part, defendant's motion to exclude some of the prior-bad-act evidence as inadmissible under Rules 404(b) and 403 or as violative of the Confrontation Clause. For the remaining evidence proffered by the State, the court denied defendant's motion to exclude under Rules 404(b) and 403.

¶ 10. On October 29, 2005, a jury convicted defendant of second-degree murder and domestic assault. Defendant waived his right to a jury trial on whether he was a habitual offender, and stipulated to a 2001 conviction for domestic assault and three prior felony convictions. The court entered a guilty verdict on the second-degree murder and felony domestic assault charges and adjudicated defendant a habitual offender.

¶ 11. After trial, defendant moved for judgment of acquittal, arguing that the State failed to prove that defendant assaulted Ms. Genest or that his actions caused her death or serious bodily injury. Defendant likewise filed a motion for a new trial, contending that the verdict was against the weight of the evidence and that the court erred by: (1) admitting evidence of defendant's prior assaults on Ms. Genest; (2) instructing the jury about the legal effect of Ms. Genest's vulnerability; and (3) denying defendant's request for special verdict questions. The court denied both motions, and this appeal followed.

¶ 12. Defendant reasserts his previous arguments on appeal. First, he claims that the court committed reversible error by admitting evidence of his prior assaults on Ms. Genest. Next, he argues that the court should have granted his motion for judgment of acquittal because the State presented insufficient evidence to prove that he assaulted Ms. Genest or that the assault caused her death. Furthermore, defendant contends that the court's jury instruction on the legal effect of Ms. Genest's vulnerability amounted to a directed verdict and was reversible error. Finally, he claims that the court erred in declining to submit a special verdict form to the jury at defendant's request.

¶ 13. We begin with defendant's claim that the trial court erred in admitting evidence of his prior bad acts against Ms. Genest. Defendant contests the trial testimony of several witnesses to his prior abuse of Ms. Genest, arguing that it was propensity evidence and therefore violated Rule 404(b). The following 404(b) evidence was produced at trial. Ms. Genest's sister-in-law testified to an incident in 1994 in which Ms. Genest called her after defendant had allegedly beaten her. When the sister-in-law arrived on the scene, Ms. Genest was crying and the side of her face was bruised from eyebrow to chin. Ms. Genest's brother testified that he confronted defendant after this incident, and that defendant immediately apologized, said that he did not know why he did it, and promised never to do it again. A Burlington police officer gave

testimony that he was called to the scene of a domestic distur-
bance at the couple's home in January 1999, and that upon arrival,
he found Ms. Genest crying with a golf-ball-sized lump over her
eye. A neighbor testified that in 1999 or 2000 she witnessed the
couple fighting and later noticed that Ms. Genest had a black eye
or bruises on her face. Ms. Genest allegedly told her that this was
nothing new. Finally, a longtime friend of Ms. Genest's testified to
several instances in which she observed defendant acting violently
toward Ms. Genest. On one occasion, at a barbecue at the friend's
house, defendant grabbed Ms. Genest by the throat and began
choking her, apparently because he wanted her to leave the party
with him. On another occasion, at the beach, defendant tried to
drag Ms. Genest to the car by her hair because she said she was
not ready to go when he wanted to leave.

¶ 14. Under Rule 404(b), "[e]vidence of other crimes,
wrongs, or acts is not admissible to prove the character of a
person in order to show that he acted in conformity therewith."
Nonetheless, such evidence may be introduced if it is "relevant to
some other legitimate issue in the case, such as motive, plan or
identity." *State v. Lawton*, 164 Vt. 179, 182, 667 A.2d 50, 54 (1995);
see also V.R.E. 404(b). Even if the bad-act evidence is relevant to
show something other than the defendant's propensity for crimi-
nality, however, it may be excluded under Rule 403 if the danger
of unfair prejudice to the defendant substantially outweighs its
probative value. V.R.E. 403. As with other evidentiary rulings, we
give deference to the trial court's decision to admit bad-act
evidence pursuant to Rule 404(b), and review its decision only for
abuse of discretion. *State v. Anderson*, 2005 VT 17, ¶ 7, 178 Vt.
467, 868 A.2d 716 (mem.).

¶ 15. The trial court did not abuse its broad discretion under
Rule 404(b) in admitting evidence of defendant's prior abuse of
Ms. Genest. In its decision on the motion in limine, the court
allowed the testimony of the five witnesses under Rule 404(b) both
to provide context of the nature of the couple's relationship and to
rebut defendant's theory that Ms. Genest's death was accidental.
Defendant challenges the court's reasoning, contending that the
prior-assault evidence was not needed to rebut a defense of
accident because the defense did not present such a theory at
trial. Whether or not defendant presented evidence of Ms. Genest
falling in the bathroom, possibly hitting her head, and later

vomiting in an effort to establish that her death was accidental is of little consequence, however, because his prior abuse of Ms. Genest was relevant to other issues in the case. See *State v. Lafountain*, 160 Vt. 313, 316, 628 A.2d 1243, 1246 (1993) (this Court may uphold a ruling on different grounds than the trial court). To convict defendant of second-degree murder, the State had the burden of proving that he acted with the requisite intent — wanton disregard for Ms. Genest's life — and, thus, there is no doubt that defendant's motive and intent were relevant to the State's case. See *State v. Sexton*, 2006 VT 55, ¶ 14, 180 Vt. 34, 904 A.2d 1092 (stating that second-degree murder requires either intent to kill or, at the very least, wanton disregard of the likelihood that one's actions will cause great bodily harm or death). Where, as here, defendant's prior bad acts were perpetrated against the same victim, the evidence serves essentially the same purpose as an admission of intent to harm that particular victim, rather than establishing defendant's general propensity for violence. Thus, defendant's prior intense hostility toward Ms. Genest, often in response to minor inconveniences, was probative evidence of defendant's motive to harm Ms. Genest on the night in question, and was not admitted solely to show defendant's propensity to act in conformity with a particular character trait. See, e.g., *State v. Yoh*, 2006 VT 49A, ¶ 18, 180 Vt. 317, 910 A.2d 853 (allowing evidence of prior incidents of domestic violence at murder trial to demonstrate the defendant's motive and intent under 404(b)); *People v. Illgen*, 583 N.E.2d 515, 522-23 (Ill. 1991) (holding that evidence of pattern of domestic abuse was probative of defendant's motive and mental state in first-degree murder case); *State v. Taylor*, 689 N.W.2d 116, 128 (Iowa 2004) (stating that the defendant's prior acts of violence against his wife were relevant to his motive and intent in breaking window and pulling wife out of vehicle).

¶ 16. Nevertheless, defendant contends that the danger of unfair prejudice substantially outweighed the probative value of the prior-assault evidence, and that it should therefore have been excluded under the Rule 403 balancing test. In its decision on the motion in limine, the trial court determined that the evidence of defendant's prior assaults on Ms. Genest was indeed prejudicial to defendant, as is any evidence presented by the State to prove defendant's guilt. It reasoned, however, that the testimony of the five witnesses to the abuse was not unduly prejudicial given the

lack of direct evidence in the case. Ms. Genest's friend testified that when she left the couple's home on the evening of May 4, Ms. Genest was uninjured. Ms. Genest was not seen again by anyone other than defendant until the following afternoon, at which point she had life-threatening injuries that ultimately led to her death a few days later. Because Ms. Genest and defendant were alone during the critical period in which she sustained the deadly injuries, the State's case against defendant was largely circumstantial and, thus, the probative value of any evidence tending to show defendant's hostility toward Ms. Genest was high.

█ ¶ 17. Defendant challenges the court's Rule 403 balancing, claiming that the testimony of the five witnesses was unnecessary and unfairly prejudicial, given that the nature of the relationship between defendant and Ms. Genest had already been established by other means. At trial, Ms. Bolsta testified that defendant told her that he had hit Ms. Genest in the chest on the night in question. Furthermore, the parties entered into a stipulation, allowing the State to present to the jury defendant's 2002 conviction for domestic assault on Ms. Genest. Although another court might have concluded that the prior assault evidence was cumulative and therefore unfairly prejudicial, it was not untenable for the court to conclude that evidence of defendant's prior domestic assault conviction and admission to hitting Ms. Genest once in the chest was far less probative of defendant's motive on the night in question than the 404(b) evidence of defendant's repeated, hostile treatment of Ms. Genest throughout the course of their eleven-year relationship, often in response to such minor provocations as Ms. Genest's delay. See *State v. Shippee*, 2003 VT 106, ¶ 13, 176 Vt. 542, 839 A.2d 566 (mem.) (trial court has broad discretion in conducting Rule 403 balancing test, and we will not overturn its decision unless "the court either completely withheld its discretion or exercised it on grounds clearly untenable or unreasonable"). In addition, the court made efforts to ensure that the jury would not misuse the 404(b) evidence by giving a limiting instruction after each of the witnesses to the prior assaults testified, directing that they were not to consider the evidence for propensity purposes. As the trial court concluded, the 404(b) evidence was highly probative given the circumstantial nature of the State's case and was not unfairly prejudicial, particularly in light of the limiting instructions. Thus, the trial court did not

abuse its discretion by allowing the five witnesses to testify about defendant's prior assaults on Ms. Genest.

¶ 18. Defendant next argues that the trial court erred in denying his motion for judgment of acquittal. Specifically, he claims that the State's evidence was insufficient to prove beyond a reasonable doubt that he committed any act that resulted in Ms. Genest's serious bodily injury or death. In determining the sufficiency of the evidence against defendant, we consider "whether the evidence, when viewed in the light most favorable to the State and excluding any modifying evidence, fairly and reasonably tends to convince a reasonable trier of fact that the defendant is guilty beyond a reasonable doubt." *State v. Perez*, 2006 VT 53, ¶ 19, 180 Vt. 388, 912 A.2d 944 (quotation omitted). In a case based largely on circumstantial evidence, the jury may draw reasonable inferences in determining whether the defendant committed the acts charged. *State v. Baird*, 2006 VT 86, ¶ 13, 180 Vt. 243, 908 A.2d 475. In such a case, we must consider the evidence as a whole in making our determination, even though each individual piece of circumstantial evidence might otherwise be easily explained. *Id.*

¶ 19. The trial court did not err in determining that the State's evidence was sufficient to convince the jury of defendant's guilt beyond a reasonable doubt. To begin, both the medical examiner and the neurologist who assisted him testified that Ms. Genest's death was caused by blunt force trauma to the head. The medical examiner testified that her multiple impact injuries and twelve fractured ribs could not have been sustained from a single fall, and that the injuries were consistent with having been inflicted within seventy-two to ninety-six hours of her death on May 8, as was the subdural hematoma to her brain.

¶ 20. Furthermore, while the evidence was largely circumstantial, the inference that defendant caused Ms. Genest's injuries was strong. The State presented testimony from several witnesses who observed that Ms. Genest was uninjured before she returned home from the bar on the evening of May 4. Ms. Genest's friend, the last person besides defendant to see Ms. Genest in an uninjured state, testified that defendant pushed Ms. Genest in the chest just before the friend left the couple's apartment. Even when it was clear that Ms. Genest had grave injuries, there was testimony that defendant hesitated to take her to the hospital

because he was concerned about hospital personnel seeing the various bruises on her body. The jury further heard that, upon arrival at the hospital, defendant gave various palpably false accounts of what happened to Ms. Genest — e.g., that she might have been in a fight in Montreal or overdosed on Klonopin. In addition, when defendant was interviewed by police the day after Ms. Genest was admitted to the hospital, he lied to the officer and said that his roommate was present when Ms. Genest allegedly fell in the bathroom, and then when caught in a lie, amended his story to another falsehood, that Ms. Bolsta was present when Ms. Genest purportedly fell. Taken as a whole, this evidence fairly and reasonably supported the jury's finding of guilt beyond a reasonable doubt, and it was not error for the trial court to deny defendant's motion for judgment of acquittal. See *id.*

¶ 21. Notwithstanding the evidence against him, defendant argues that the jury decision was based on mere conjecture and speculation by the State's medical witnesses. He suggests that it was unreasonable for the jury to convict based on that evidence, given that his own medical expert testified "with reasonable medical certainty" that Ms. Genest died as a result of intoxication, vomiting, aspirating vomit, and being unable to protect her airway for a significant period of time. Defendant's argument is unavailing. It was well within the purview of the jury to reject defendant's expert testimony in favor of the State's, and we will not substitute our judgment for that of the trier of fact. See *Perez*, 2006 VT 53, ¶ 21. Furthermore, our standard of review of motions for judgment of acquittal requires us to exclude any modifying evidence in considering whether the evidence presented by the State fairly supported a finding of guilt beyond a reasonable doubt. See *State v. Lemay*, 2006 VT 76, ¶ 11, 180 Vt. 133, 908 A.2d 430. Excluding defendant's modifying medical evidence here, there was ample evidence presented by the State that defendant committed the acts alleged.

¶ 22. With respect to defendant's next issue on appeal — whether the court directed a verdict on the murder charge by instructing the jury on Ms. Genest's vulnerability — the record is unclear as to whether defendant properly preserved the issue. During the charge conference, defendant objected to the portion of the court's instruction on causation that read: "Any evidence that Ms. Genest may have been more susceptible to death or

serious bodily injury due to the ingestion of alcohol or drugs is of no legal . . . significance on the element of causation." After some back-and-forth between defense counsel, the state's attorney, and the court, it appears in the record that all parties agreed to amend the instruction to the following: "if you find that Ms. Genest was more vulnerable to death or serious bodily injury due to the prior ingestion of alcohol, you are not to consider it on the element of causation." After the agreed-upon instruction was read to the jury, however, the defense appeared to object, stating: "just renew the [objection] about the causation . . . . I thought you were going to emphasize the causation, you were going to highlight it . . . and having given it, I'm concerned." Because the record is not clear, we consider the merits of defendant's argument.

¶ 23. Defendant argues that the vulnerability instruction was tantamount to directing the verdict for the State because it precluded the jury from considering his theory that Ms. Genest's intoxication caused her inability to protect her airway and led to the hypoxic ischemia that resulted in her death. We review jury instructions in their entirety to determine if they sufficiently guided the jury and did not have a prejudicial impact on their deliberations. *State v. Martin*, 2007 VT 96, ¶ 39, 182 Vt. 377, 944 A.2d 867. If the jury charge as a whole breathes the true spirit and doctrine of the law, we will uphold it. *State v. Jackowski*, 2006 VT 119, ¶ 4, 181 Vt. 73, 915 A.2d 767.

¶ 24. The court's instructions on the murder charge accurately reflected the law on the element of causation. We have recently restated that "where [a] defendant's unlawful act is established in the chain of direct legal causation he is criminally responsible for the course of events which naturally follow from that act, unless the act of another breaks the chain of causation of the original negligent actor." *Martin*, 2007 VT 96, ¶ 40. In conformity with this legal principle, the court instructed the jury that the State was required to prove that defendant's "acts produced [Ms.] Genest's death in a natural and continuous sequence, unbroken by any efficient intervening cause." Furthermore, the charge directed that the jury would have to conclude that Ms. Genest's life was ended "by means other than natural causes, accident or suicide," for it to convict defendant of second-degree murder. Finally, the jury was instructed that it could convict defendant only if it found that Ms. Genest's death would not have occurred "but for" defendant's

physical assault on her. The instruction on vulnerability that defendant now challenges simply clarified that a condition — e.g., intoxication — that makes a victim more vulnerable to harm cannot be considered on the issue of causation if the jury finds beyond a reasonable doubt that the defendant's actions caused the victim's injury. See *State v. Dodge*, 152 Vt. 503, 505-06, 567 A.2d 1143, 1144 (1989) (holding that victim's failure to wear seatbelt made him more vulnerable to injury but was not an intervening cause absolving the defendant of negligent and careless operation of a motor vehicle).

¶ 25. Contrary to defendant's assertion, the jury instruction in question did not take the issue of causation away from the jury and would have been consistent with a jury verdict of acquittal if the jury had believed defendant's theory that Ms. Genest's death was caused by complications from her alcohol consumption. Looking at the jury instructions as a whole, they were full and fair and correctly stated the law with regard to the element of causation. See *State v. Swift*, 2004 VT 8A, ¶ 12, 176 Vt. 299, 844 A.2d 802 (stating that "[a] defendant is entitled to jury instructions that are full, fair, and correct on all issues, theories, and claims presented by the evidence." (quotation omitted)). Defendant has failed to demonstrate either that the jury instructions were erroneous with respect to the law or that he was prejudiced in any way by the vulnerability instruction. See *id.* (reversal required for erroneous jury instruction only if the defendant demonstrates prejudice).

¶ 26. Finally, we briefly address defendant's argument that the trial court committed reversible error by denying his request to submit special verdict questions to the jury. Prior to closing argument, defendant moved the court to allow him to submit a special verdict form to the jury that would require it to answer the following questions: (1) "Was Sarah Genest physically assaulted by [defendant]"; (2) "Did Sarah Genest have a condition at the time of the assault which rendered her more vulnerable to death from the assault"; and (3) "Did Sarah Genest die as the result of the physical assault?" The court denied the request, concluding that the questions were unnecessary because they were addressed by the proposed jury instructions. We agree with the court's assertion that the jury instructions adequately covered the element of causation on the murder charge, and rendered defendant's special verdict questions redundant. In any event, defendant

concedes that criminal defendants do not have a right to have special interrogatories submitted to the jury, and indeed that the practice is disfavored, except where contemplated by statute. See Reporter's Notes, V.R.Cr.P. 31 (explaining that "there are no special verdicts in criminal proceedings" however, "[o]ccasionally, a statute may require a specific finding of the jury"); see also *United States v. Pforzheimer*, 826 F.2d 200, 205 (2d Cir. 1987) (jury interrogatories are "generally disfavored" in criminal cases); *State v. Bock*, 328 P.2d 1065, 1074 (Idaho 1958) (practice of requiring jury to answer special questions should not be encouraged, except where specified by statute); *Arevalo v. State*, 749 S.W.2d 278, 280 (Tex. App. 1988) (criminal defendants do not have right to have special issues submitted to jury, except in capital cases). We discern no error on the part of the trial court in declining to submit a special verdict form to the jury.

*Affirmed.*