2008 VT 134

## State of Vermont v. Henry Butson

[969 A.2d 89]

No. 07-198

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed November 21, 2008

*Robert Butterfield*, Caledonia County State's Attorney, St. Johnsbury, for Plaintiff-Appellee.

*Matthew F. Valerio*, Defender General, and *Anna Saxman*, Deputy Defender General, Montpelier, for Defendant-Appellant.

¶ 1. **Reiber, C.J.** Defendant Henry Butson, who pled nolo contendere in October 2004 to two second-degree murders, appeals from his plea and sentence. He contends that: (1) our decision in *State v. Provost*, 2005 VT 134, 179 Vt. 337, 896 A.2d 55, requires reversal of his sentence; (2) he did not waive the insanity defense; and (3) the trial court abused its discretion in finding that his mental state did not significantly decrease his culpability. We affirm.

¶ 2. In June 2003, defendant was charged with two counts of first-degree murder for causing the deaths of his former girlfriend (Karen) and his best friend (Melvin). Melvin and Karen started a relationship after Karen broke up with defendant. Before the killings, defendant had come to suspect that the two were having what he considered an illicit relationship. He felt that he had been betrayed, and in the spring of 2003 he began, essentially, to surveil the two. Defendant also told an acquaintance that he should have killed the two victims when he saw them together during turkey-hunting season in May 2003.

¶ 3. On June 1, 2003, defendant was going to a hunting camp where he and Melvin had spent time together over the years, when he came across Karen and Melvin, who were coming from the camp. He asked them how long they had been there, and they told him it had been about forty-five minutes. The three parted company, and defendant went to a neighboring camp to talk with an acquaintance. While there, he learned that Melvin and Karen had actually been at the camp for a couple of hours. Defendant became angry and told the neighbor that he would have shot Karen and Melvin if he had caught them in bed together.

¶ 4. At about 6:00 that evening, defendant drove to Melvin's house and discovered that Karen was also there. Defendant confronted Melvin and Karen about their relationship, to which

they eventually admitted. Defendant became angry, told Karen that he still loved her, and said that he had trusted Melvin like a brother. Karen told Melvin to put defendant out of the house, and Melvin pushed him out the door. Defendant went to his truck, loaded his shotgun and pistol, and returned to the house with the weapons. Finding the front door locked, he shot a hole in the door and then shot the door handle off. He entered the home and chased Karen and Melvin to the bedroom, where he shot and killed them both. Defendant then fled into a remote wooded area, where he remained until he was apprehended some days later.

¶ 5. Defendant was charged with two counts of first-degree murder. 13 V.S.A. § 2301. Prior to trial, defendant's attorney advised the court several times that he and defendant were discussing or considering raising an insanity defense, and that he had retained the services of a psychiatrist to examine defendant and possibly testify for him. The State deposed defendant's expert and engaged an expert of its own. Defendant never provided formal notice to the court that he would be pursuing an insanity defense, however. See V.R.Cr.P. 12.1(a).

¶ 6. In late August 2004, the State amended the information to charge defendant with aggravated murder. See 13 V.S.A. § 2311 (defining aggravated murder). At a status conference soon thereafter, the parties indicated to the court that they were discussing a possible plea bargain. At the same status conference, the court mentioned the then-recent decision of the United States Supreme Court in *Blakely v. Washington*, 542 U.S. 296 (2004), and stated that the parties would need to address its impact on the instant case prior to trial.

¶ 7. In early October 2004, the parties executed a plea agreement and filed it with the court. The State agreed to amend the charges to two counts of second-degree murder, 13 V.S.A. §§ 2301, 2303(b) (1998)[1], and agreed that any sentences imposed would run concurrently. Defendant agreed to enter nolo contendere pleas to both charges. He also waived his right to have a jury decide whether aggravating factors justified an upward departure from the presumptive minimum sentence of twenty years, and acknowledged that the State could argue in favor of a maximum sentence

---

[1] The sentencing statute was amended in 2006. See 2005, No. 119 (Adj. Sess.), § 2, eff. May 1, 2006. All citations in this opinion are to the pre-amendment statute, unless otherwise noted.

up to life without parole. The agreement mandated that the State would have the burden of proving "to the sentencing Court's satisfaction beyond a reasonable doubt the existence of any aggravating factors." Defendant reserved the right to present evidence and argument in support of mitigating factors that might convince the court to impose a minimum sentence of as little as ten years. See *id.* The agreement was silent as to the burden of proof on the mitigating factors, but the parties and the court appear to have proceeded on the assumption that defendant bore the burden of showing the presence of mitigating factors by a preponderance of the evidence, rather than beyond a reasonable doubt. The plea agreement concluded by stating that defendant "agrees that this process serves to comport with the due process standards regarding pleading and notice as required by *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Blakely v. Washington*."

¶ 8. Pursuant to the agreement, the State notified defendant that it would attempt to prove five aggravating factors: (1) the "victim of each murder was particularly weak, vulnerable and helpless in that they were unarmed, and trapped in a remote location"; (2) "[t]he murders were particularly severe, brutal or cruel" because defendant "shot his way into the home," "broke his way into the room," and wounded Karen and Melvin before killing them; (3) the murders involved multiple victims; (4) the murders were "predatory in nature"; (5) the murders were "deliberate and malicious." See 13 V.S.A. § 2303(d). Defendant contested the aggravating factors and, as a mitigating factor, argued that "the facts support a finding that . . . defendant was suffering from a mental condition that significantly reduced his culpability."

¶ 9. After a hearing, the judge found that the State had carried its burden of proof as to three of the five asserted aggravating factors: (1) there were multiple victims; (2) the victims were particularly weak, vulnerable, or helpless; and (3) the murders were particularly severe, brutal, or cruel. The court found, however, that the State had not met its burden as to the other two asserted aggravating factors: (1) that the murders were "predatory"; and (2) that the murders were considered, deliberate, and malicious.

¶ 10. Defendant proposed two mitigating factors at the hearing: first, that he had no prior criminal history; and second, that his mental state significantly reduced his culpability. The court found that the first was "established beyond a reasonable doubt." The

court then found that the evidence was insufficient, under the preponderance standard, to show that defendant's mental state was a formal mitigating factor. Next, the court balanced the three aggravating factors against the mitigating factor, concluded that the former substantially outweighed the latter, and sentenced defendant to a term of twenty-five years to life. As noted, the presumptive term for second-degree murder is twenty years to life. 13 V.S.A. § 2303(b). This appeal followed.

## I. The Burden of Proof

¶ 11. Defendant's first contention is that our decision in *State v. Provost*, 2005 VT 134, 179 Vt. 337, 896 A.2d 55, requires reversal of his sentence. Specifically, defendant asserts that he never waived his right to have the judge find the presence or absence of mitigating factors beyond a reasonable doubt. Defendant contends, citing *Mullaney v. Wilbur*, 421 U.S. 684, 697-98, 704 (1975), that it is settled law that the prosecution must "prove beyond a reasonable doubt the absence of the heat of passion or sudden provocation when the issue is properly presented in a homicide case." Given the facts of this case, we find no basis to reverse.

¶ 12. *Provost* implemented the federal constitutional imperatives announced in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Blakely v. Washington*, 542 U.S. 296 (2004), both of which had been decided at the time of the plea agreement in this case. In *Apprendi*, the high Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. Under *Apprendi*, sentencing judges retain discretion to impose any sentence within the range prescribed by statute. *Id.* at 481. The Court clarified in *Blakely*, however, that the " 'statutory maximum' . . . is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" *Blakely*, 542 U.S. at 303. "In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." *Id.* at 303-04.

¶ 13. Accordingly, in *Provost* we held that Vermont's murder-sentencing statute was unconstitutional because it allowed judges

to impose sentences greater than the *Blakely*-defined statutory maximum based on judge-made findings. *Provost*, 2005 VT 134, ¶ 17. We held that the statute violated "the rule in *Apprendi* and *Blakely* because it requires the sentencing court to weigh specific aggravating and mitigating factors not found by a jury beyond a reasonable doubt before imposing a sentence of life without parole." *Id.* We also explicitly held that "[a]ny sentence the trial court might impose above the presumptive term of thirty-five years to life would necessarily rely on impermissible findings regarding the presence of aggravating factors *and the absence of mitigating factors*." *Id.* ¶ 20 (emphasis added). We concluded our opinion in *Provost* by declining to create our own sentencing procedure that would comply with *Apprendi* and *Blakely*, instead inviting the Legislature to amend the murder sentencing statute. *Id.* ¶ 21. *Provost* issued on December 23, 2005.

¶ 14. The Legislature responded in the next legislative session with comprehensive amendments to the sentencing statute. 2005, No. 119 (Adj. Sess.), § 2, eff. May 1, 2006 (amending 13 V.S.A. § 2303). Under the new statute, persons convicted of murders committed before May 1, 2006 have a right to have aggravating and mitigating factors found by a jury beyond a reasonable doubt before a sentence above the statutory maximum can be imposed. *Id.* As noted, defendant's crime occurred in 2003, and he contends that he has a right to the procedures announced in the amended statute.[2] Under that statute, defendant argues, the judge's finding — that defendant's mental state did not significantly reduce his culpability — increased the penalty above the statutory maximum, and was therefore plain error because the judge did not find the absence of the mitigating factor beyond a reasonable doubt. We disagree.

¶ 15. Defendant did not object at trial to the judge making findings regarding his mental state's impact on sentencing; indeed, defendant explicitly bargained for precisely the procedures employed, citing *Blakely* and attempting to take a "conservative" approach. Defendant benefited from this bargain by receiving in exchange the State's agreement to prosecute him for second-

---

[2] Subsection (g) of the amended statute does not mandate application of the new sentencing provisions to defendant, as his sentence was not "stricken and remanded for resentencing pursuant to [our] decision in *State v. Provost*, 2005 VT 134 (2005)." 13 V.S.A. § 2303(g)(2) (Cum. Supp. 2008).

rather than first-degree murder. Because defendant did not object at trial, our review is for plain error, which is error that we must recognize in order to avoid "a miscarriage of justice," or error "so grave and serious that it strikes at the very heart of the defendant's constitutional rights." *State v. Brochu*, 2008 VT 21, ¶ 71, 183 Vt. 269, 949 A.2d 1035. Put another way, we will reverse based on plain error only when: (1) there was an error; (2) the error is obvious; (3) the error affects substantial rights and results in prejudice to defendant; and (4) the error seriously undermines the fairness, integrity, or public reputation of judicial proceedings. *State v. Yoh*, 2006 VT 49A, ¶¶ 39-40, 180 Vt. 317, 910 A.2d 853 (citing *United States v. Olano*, 507 U.S. 725, 734, 736 (1993), and using the standard announced therein as "a guide for applying our own plain-error standard").

■■ ¶ 16. We cannot find plain error on the record before us. The parties, in close cooperation with the trial judge, attempted to forecast this Court's response — which would come in *Provost* — to *Apprendi* and *Blakely*, both of which had been decided before the plea agreement was reached. As was noted at oral argument in this case, the plea agreement "predicted half of *Provost*." That is, the parties correctly surmised that we would conclude that the then-operative murder-sentencing statute was unconstitutional because it allowed increased sentences based on judge-made findings of aggravating factors. See *Provost*, 2005 VT 134, ¶ 15. What the plea agreement did *not* predict, however, was *Provost*'s additional conclusion that *mitigating* factors must be found by the jury beyond a reasonable doubt, because such factors may be "as essential to the punishment defendant received as the presence of the aggravating factors." *Id.* ¶ 19 (quotation omitted).

¶ 17. The question, in short, is whether the trial court's decision to adopt a plea agreement that imperfectly predicted the outcome of a then-unknown future case in an unsettled area of the law was "a miscarriage of justice" or struck "at the very heart of the defendant's constitutional rights." *Brochu*, 2008 VT 21, ¶ 71. Under these standards, defendant's sentencing was not plain error. This plea bargain, though not precisely congruent with *Provost*, was entirely consonant with the state of the law at the time it was struck. Neither *Apprendi* nor *Blakely* clearly mandated, as *Provost* did, that juries find the absence of mitigating factors. Indeed, *Apprendi* implied that the Sixth Amendment requires jury consideration only of aggravating factors, and not of the absence

of mitigating factors. *Apprendi*, 533 U.S. at 490 n.16 ("If facts found by a jury support a guilty verdict of murder, the judge is authorized by that jury verdict to sentence the defendant to the maximum sentence provided by the murder statute."); see also, e.g., *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir. 2005) ("[N]o Supreme Court . . . authority requires the State to prove the absence of mitigating circumstances beyond a reasonable doubt."). Also, and more importantly, defendant had able trial counsel when he agreed that he would have the burden of proving the mitigating factors by a preponderance of the evidence, and the trial judge conducted a thorough and careful colloquy before accepting the agreement. Further, while the trial judge concluded that defendant had not proven mitigation based on his mental state by a preponderance of the evidence, the judge did state that he would take defendant's mental state into account when deciding on a sentence. This is not the stuff of plain error.

¶ 18. This case is closely akin to *State v. King*, in which we concluded that a defendant who agreed to "have the trial court serve as finder of fact to determine the appropriate sentence . . . [had] waived his right to challenge the trial court's sentencing procedure on appeal." 2006 VT 18, ¶ 13, 179 Vt. 400, 897 A.2d 543; see also *King v. Hofmann*, 2007 WL 3333393, at **8-9 (D. Vt. 2007) (dismissing federal habeas petition filed by the defendant from *State v. King*). Similarly, in *Blakely* itself, the United States Supreme Court explained that "[w]hen a defendant pleads guilty, the State is free to seek judicial sentence enhancements so long as the defendant either stipulates to the relevant facts or consents to judicial factfinding." 542 U.S. at 310. Defendant here, like King and the hypothetical defendant in *Blakely*, consented to judicial factfinding regarding mitigating factors. Defendant agreed — in open court, with counsel present — that he would bear the burden of showing that his culpability, and therefore his sentence, should be reduced because he acted in sudden passion. His consent to bear that burden, given as it was in the presence of counsel and after a meticulous and thorough plea colloquy, militates strongly against finding plain error here. The error, if any, was not obvious, and does not undermine the fairness or integrity of judicial proceedings. See *Yoh*, 2006 VT 49A, ¶ 39 (citing *Olano*, 507 U.S. at 734-36); see also *State v. White*, 2007 VT 113, ¶ 14, 182 Vt. 510, 944 A.2d 203 ("Allowing aggravating factors found by a judge by a preponderance of the evidence to enhance a sentence

after a constitutionally sound conviction can hardly be said to create a fundamentally unfair criminal trial."). Nor does our decision in *Yoh* require us to reverse here. In *Yoh*, unlike in this case, there was no plea agreement that accounted for *Apprendi* and *Blakely*, and whereby the defendant agreed, as part of the bargain for lesser charges, to bear the burden of establishing mitigating factors by a preponderance of the evidence.

## II. The Insanity Defense

¶ 19. Defendant also argues that he did not waive the insanity defense, and that his plea must therefore be reversed under *State v. Brown*, 2005 VT 104, ¶ 36, 179 Vt. 22, 890 A.2d 79. We disagree.

¶ 20. Defendant had the right to decide personally whether to present an insanity defense. *State v. Bean*, 171 Vt. 290, 302, 762 A.2d 1259, 1267 (2000). Although defendant, through counsel, mentioned several times before trial that he might present an insanity defense, he never filed written notice that he would actually attempt to prove that he was not guilty by reason of insanity. See V.R.Cr.P. 12.1(a) ("A defendant who wishes to offer an alibi, raise the issue of insanity or offer expert testimony relating to a mental disease, or defect or any other mental condition of the defendant bearing upon the issue of his guilt must give written notice thereof . . . ."). Rather, as noted above, he chose to present his mental state as a factor in mitigation of his culpability for sentencing purposes.

¶ 21. As we noted in *Bean*, "notice of use of an insanity defense is essentially a plea of not guilty by reason of insanity." *Bean*, 171 Vt. at 301, 762 A.2d at 1266. Here, of course, defendant's actual notice of plea was expressly to the contrary. By his plea, defendant acknowledged that there was a factual basis for convicting him of second-degree murder. Defendant further agreed, expressly and in open court, that he was "a person who . . . willfully, and with intent to kill, did kill" the victims. Our review of the record also reveals that the trial judge conducted a prolonged colloquy with defendant to determine whether defendant's plea was knowing and voluntary. See V.R.Cr.P. 11(c), (d). The trial court found that it was, and defendant does not directly challenge that finding on appeal.

¶ 22. Defendant's citation of *Brown* does not persuade us that he did not effectively waive the insanity defense. In *Brown*, we

concluded that a defendant who stipulated prior to trial that he would *permanently* waive his ability to raise mental capacity, either as an affirmative defense or as a factor in mitigation of sentence, did not effectively do so because the court conducted no colloquy at all. *Brown*, 2005 VT 104, ¶ 39. More to the point, we went on to make clear that "we continue to adhere to the distinction made in *Davignon* that such a discussion is unnecessary if defendant will place his mental capacity in issue in another way." *Id.* ¶ 36 (citing *State v. Davignon*, 152 Vt. 209, 221, 565 A.2d 1301, 1307-08 (1989)). In *Davignon*, we noted that the defendant's decision to assert diminished capacity rather than insanity was a tactical decision, and not a waiver of an "essential element[] of a criminal trial." *Davignon*, 152 Vt. at 221, 565 A.2d at 1308.

¶ 23. Defendant in this case is in a position closer to the defendant in *Davignon* than to the defendant in *Brown*. Here, defendant's decision to present mental-state evidence only in support of a lesser sentence was a tactical one, apparently animated by his own belief that a jury would not be convinced by his insanity defense. Further, unlike the defendant in *Brown*, defendant here never formally raised the insanity defense, as required by our criminal rules. See V.R.Cr.P. 12.1(a). Thus, under the totality of the circumstances in this case, we find no error in the trial court's treatment of defendant's purported insanity defense. See *State v. Merrill*, 155 Vt. 422, 427, 584 A.2d 1129, 1132 (1990) (validity of waiver of trial rights based on totality of the circumstances).

### III. Defendant's Mental State and Culpability

¶ 24. Defendant next contends that the trial court abused its discretion in finding that his mental state did not significantly reduce his culpability. See *State v. Ingerson*, 2004 VT 36, ¶ 10, 176 Vt. 428, 852 A.2d 567 (reviewing sentencing decision for abuse of discretion). We find no abuse of discretion. The trial court had before it a great deal of evidence concerning defendant's mental state, including testimony and written reports from two doctors, Helzer and Drukteinis. The court found that their assessments were "competing, and at times, frankly, agreeing." The court recounted the doctors' testimony at some length on the final day of the sentencing hearing, and ultimately found that defendant suffered from both "diagnosable . . . conditional depression" and

"bipolar II" at the time of the offenses. Bipolar II, as the court found, is a milder version of bipolar disorder. Dr. Drukteinis testified, and the court found, that "bipolar illness would not serve to alleviate, mitigate, reduce culpability; as such . . . it was not such a mental illness as would grossly impair and remarkably impair judgment."

¶ 25. The court then noted that the principal dispute between the experts was whether, at the time of the crimes, defendant "was experiencing a dissociative disorder described by Dr. Helzer . . . as a 'fugue state,' as a circumstance of detachment or removal from experience such that recollection and recall processing are impaired." Dr. Drukteinis did not believe that defendant was in such a state at the time of the murders, noting that defendant retained detailed memories of the murders and wrote those memories down while he was hiding in the woods. Drukteinis further opined that the "fugue state" diagnosis was inconsistent with the fact that defendant had no significant mental-health history of any kind, much less of memory loss or dissociation. The court agreed with Dr. Drukteinis, finding that defendant had "a fairly detailed recollection of the events immediately leading up to the shootings," as evidenced by a note he wrote after the shootings, which the court found "display[ed] a clear and rational mindset." Based on these findings, the court found that defendant, although he was "in an emotionally distraught mental state," did not suffer from a "dissociative disorder" (i.e., he was not in a "fugue state"), and that his culpability was therefore not significantly reduced.

¶ 26. This careful weighing of the competing testimony is plainly not an abuse of discretion. Defendant's argument to the contrary is essentially an attack on the trial court's decision to credit Dr. Drukteinis' assessment, a decision that was squarely within the trial court's discretion, and which we decline to disturb on the record before us.

*Affirmed.*