2012 VT 36

## State of Vermont v. Jason Mead

[54 A.3d 485]

No. 10-414

Present: **Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.**

Opinion Filed June 14, 2012

*Thomas J. Donovan, Jr.*, Chittenden County State's Attorney, and *Andrew R. Strauss*, Deputy State's Attorney, Burlington, for Plaintiff-Appellee.

*Matthew F. Valerio*, Defender General, and *Anna Saxman*, Deputy Defender General, Montpelier, for Defendant-Appellant.

¶ 1. **Robinson, J.** Defendant was convicted of attempted second-degree murder following a jury trial. He appeals that conviction on four grounds: (1) a State's witness and a juror had improper contact during trial; (2) the trial court admitted excerpts of defendant's testimony at a relief-from-abuse (RFA) hearing at which defendant was not represented by counsel; (3) the trial court admitted evidence of prior bad acts of defendant; and (4) the jury charge did not require the jury to identify which gunshot supported its conviction. We affirm.

¶ 2. The facts, viewing the evidence in the light most favorable to the prosecution as prevailing party, are as follows. Defendant attended a party at a Burlington apartment on a summer night in 2009. Denise Wildasin, defendant's ex-girlfriend and the mother of his child, and Tim Nunes, her new love interest, were also attendees at the party. Defendant had talked with Ms. Wildasin about getting back together the night before.

¶ 3. At one point during the party, defendant retrieved from the trunk of his car his nine-millimeter semi-automatic Ruger SR9 handgun; he tucked the gun in his waistband and kept it in his possession throughout the evening.

¶ 4. Several times at the party, defendant sought to speak with Ms. Wildasin, but she rebuffed his efforts. At one point, in an

effort to get away from defendant, Ms. Wildasin went into a bedroom with Mr. Nunes and some other partygoers. Defendant tried to enter the bedroom, but Mr. Nunes stopped him and said, "Denise doesn't want you in the room." Defendant got mad and tried to force his way into the room, and Mr. Nunes pushed him back out and slammed the door. Mr. Nunes and the others in the room laughed aloud after defendant was shut out of the room.

¶ 5. Shortly thereafter, defendant said he was not playing around and he cocked his gun while still standing outside of the door. Mr. Nunes opened the door, and defendant pulled a gun from his waist and pointed it in Mr. Nunes's face. As Mr. Nunes smacked the gun away, defendant fired the gun. Defendant then ran down a hallway six to eight feet, stopped, turned around, and fired two shots back in Mr. Nunes's direction before another partygoer tackled him. As that partygoer tackled him defendant fired another shot. Mr. Nunes began hitting defendant while he was on the floor, and defendant fired the gun again. After Mr. Nunes stopped hitting him and defendant ran out of the house, Mr. Nunes gave chase; outside, defendant pointed his weapon at Mr. Nunes again and pulled the trigger twice, though the gun did not fire.

¶ 6. The State charged defendant with attempted first-degree murder. Defendant did not deny that his gun fired while in his hand during the scuffle at the party, but testified that the gun fired because Mr. Nunes attacked him without provocation while defendant was holding the gun with his finger inside of the trigger guard. Defendant's intent was a central issue in the trial, and the jury ultimately convicted defendant of the lesser-included offense of attempted second-degree murder. Defendant appealed.

I.

¶ 7. First, we consider defendant's argument that contact between a juror and one of the State's witnesses during the trial violated defendant's right to a fair trial and impartial jury. The State's first witness was Jennifer Morrison, a lieutenant with the Burlington Police Department. Lt. Morrison was one of the first officers on the scene, arriving within a few minutes of hearing a call on the radio about the shots fired. She testified that she and another officer engaged in a protective sweep of the apartment where the party occurred in order to secure it for crime scene technicians and other first responders, and that she then served

as coordinator of the investigation and supervisor of the activities of officers on the scene. Lt. Morrison did not collect any evidence inside the apartment and did not testify about any witness interviews. During her testimony, Lt. Morrison described her observations of the apartment when she arrived; she described visible bullet holes and shell casings around the apartment, blood stains, party remnants strewn about, and a magazine for a semi-automatic pistol on the kitchen table. The State called eleven more witnesses to testify before the end of trial.

¶ 8. After the close of evidence, and immediately before the jury was called in to deliver its verdict, the State informed the trial court that after Lt. Morrison gave her trial testimony, but before the jury began its deliberations, a juror and Lt. Morrison had engaged in a personal conversation in downtown Burlington. The court took the verdict, but indicated that it would give the defense an opportunity to do follow-up investigation on the issue.

¶ 9. Lt. Morrison and the juror both testified at a post-trial hearing regarding their acquaintance and the potentially improper contact. Lt. Morrison testified that she had recognized an acquaintance from living in the same community years ago and, not recognizing the woman as a juror in this case, had approached her on Church Street in Burlington to comment on the dumplings the juror was having for lunch. They exchanged a "high-five" on the street, and the juror commented on Lt. Morrison's work, indicating that she had not previously understood the scope of the Lieutenant's job and that she had a new-found appreciation for the work Lt. Morrison did. Lt. Morrison was in uniform at the time. The juror went on to indicate that she had not recognized Lt. Morrison's name on a witness list but that she recognized her when she walked into the courtroom to testify. Lt. Morrison testified that at that point she realized that she had just engaged in contact with a juror in this case, so she quickly ended the conversation and went on her way.

¶ 10. The juror's testimony was consistent with Lt. Morrison's. Near the end of the juror's testimony, defense counsel asked the juror whether her "new-found appreciation for Lt. Morrison's job [had influenced] the way [she] judged the testimony" and whether the juror's "new-found appreciation" made the juror "believe [Lt. Morrison] more." The juror responded "no" to these questions.

¶ 11. The court credited the testimony of Lt. Morrison and the juror, and in its decision on defendant's motion for a new trial

found that, while the contact between the two "may be considered an 'irregularity'," the "evidence demonstrated convincingly that the encounter between Lt. Morrison and [the juror] did not have the capacity to affect the jury's verdict." Accordingly, the court denied defendant's motion for a new trial.[1]

■ ¶ 12. Defendant argues that the contact between the juror and Lt. Morrison violated his right to a fair trial. As we recently reiterated, " 'A defendant is entitled to a fair trial free of extraneous influences.' " *State v. Abdi*, 2012 VT 4, ¶ 12, 191 Vt. 162, 45 A.3d 29 (quoting *State v. Gorbea*, 169 Vt. 57, 60, 726 A.2d 68, 70 (1999)). This protection flows from the Sixth Amendment guarantee that " 'the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.' " *Id.* (quoting *Parker v. Gladden*, 385 U.S. 363, 364 (1966) (per curiam)).

■ ¶ 13. In order to show that an extraneous influence on a juror warrants a mistrial, a defendant must show " 'that an irregularity occurred' " and that it " 'had the capacity to affect the jury's result.' " *Abdi*, 2012 VT 4, ¶ 13 (quoting *State v. McKeen*, 165 Vt. 469, 472, 685 A.2d 1090, 1093 (1996)); *State v. Lee*, 2008 VT 128, ¶ 26, 185 Vt. 110, 967 A.2d 1161. Once a defendant sets forth sufficient evidence that an irregularity occurred and that it had the requisite capacity to affect the verdict, the State bears the burden of demonstrating that the irregularity did not actually prejudice the jurors against defendant, generally but not exclusively by demonstrating that the error was harmless beyond a reasonable doubt. *Abdi*, 2012 VT 4, ¶¶ 13-14.

■ ¶ 14. In assessing whether an irregularity had the capacity to affect the jury's result, courts should consider "the totality of the circumstances." *Id.* ¶ 15. The relevant factors in each case will be different, as illustrated by the diverse array of juror-irregularity cases that have arisen. See, e.g., *id.* ¶¶ 8-10 (juror researched cultural background of defendant — a Somali-Bantu —

---

[1] The trial court denied defendant's motion for a new trial in connection with this issue on the alternative ground that defendant's motion was untimely. In light of the trial court's indication when the issue first arose that defendant could file a post-trial motion beyond the ten-day window if the investigation of the juror-contact issue took more time, we address the merits of defendant's post-trial motion and affirm on that basis.

and reported findings to fellow jurors); *McKeen*, 165 Vt. at 470-71, 685 A.2d at 1091-92 (juror discussed details of case with a friend and told fellow jurors street value of cocaine); *Bellows Falls Vill. Corp. v. State Highway Bd.*, 123 Vt. 408, 409-10, 190 A.2d 695, 696 (1963) (one juror visited premises at issue and a number of jurors read an editorial with a very biased review of case).

¶ 15. Some of the factors that we have previously recognized as significant in a court's analysis include the relative importance of the extraneous influence to a material issue in the case, *Abdi*, 2012 VT 4, ¶ 15, whether the extraneous influence was inflammatory in nature, *id.*, and "whether there was any attempt to exert influence upon the juror," *McKeen*, 165 Vt. at 474, 685 A.2d at 1094.[2] "Because many of these criteria involve a consideration of facts from the trial itself and the trial court's first-hand observation of the jurors, we have held that 'every reasonable presumption' should be afforded the trial court's decision, and we will not disturb its ruling absent a showing of abuse or a withholding of discretion." *Abdi*, 2012 VT 4, ¶ 15 (quoting *McKeen*, 165 Vt. at 472, 685 A.2d at 1093).

¶ 16. After considering Lt. Morrison's post-trial testimony, as well as that of the juror, and in the context of the evidence in the underlying trial, the trial court concluded that neither the juror's familiarity with the officer nor their out-of-court conversation had the capacity to affect the jury's verdict. We conclude that the trial court's conclusion was supported by the record and within the trial court's discretion, and we need not reach the question of whether the State has rebutted any showing of potential prejudice.

¶ 17. First and foremost, the content of the communication between Lt. Morrison and the juror did not relate to a material issue in the case. Although the juror acknowledged her appreciation for Lt. Morrison's work, and referenced the fact that Lt. Morrison testified in the case, the two did not discuss the evidence or any material issues in the case. To the extent that the juror expressed admiration for Lt. Morrison's work, such admiration

---

[2] In *Abdi* and *McKeen* we invoked these factors in our assessment of whether the State had successfully rebutted the inference of prejudice arising from an extraneous influence, rather than at the stage of analyzing whether the event had the capacity to influence the jury in the first place. The two questions are closely related, and the factors underlying the respective analyses overlap considerably.

was not likely to influence the juror's view of the case because Lt. Morrison's testimony in the case was relatively uncontroversial. Lt. Morrison's testimony did not address the critical and related issues of defendant's credibility and intent; nor did she offer disputed testimony that tended to support the State's theory of the case versus defendant's. Her testimony simply set the stage for the State's witnesses that followed, and her own credibility was not a central issue in the case. For these reasons, this case is wholly unlike *Abdi*, in which the extraneous influence involved matters central to the issues in the case. See *Abdi*, 2012 VT 4, ¶ 23 ("The record thus demonstrates that Somali Bantu religion and culture lay at the heart of this case, and it is simply impossible to conclude that outside information used by at least one juror . . . to interpret the testimony of the Somali witnesses and to determine the credibility of these witnesses could have had no impact on the verdict." (quotations omitted)).

¶ 18. Second and related, there was nothing inflammatory about the out-of-court conversation that gave rise to this appeal. The acquaintances exchanged pleasantries and talked about dumplings. Lt. Morrison did not comment about the evidence or defendant, and she terminated the conversation as soon as she realized the acquaintance was a juror.

¶ 19. Third, Lt. Morrison did not in any way "attempt to exert influence upon" the juror. *McKeen*, 165 Vt. at 474, 685 A.2d at 1094. To the contrary, upon realizing she was speaking to a juror, she "quickly broke off the conversation."

■ ¶ 20. For these reasons, we conclude that the trial court's findings are supported by the record and that it did not abuse its discretion in denying defendant's motion for a new trial.[3]

---

[3] We have not considered as a factor supporting the trial court's ruling the juror's post-verdict testimony that her expressed new-found appreciation for Lt. Morrison's work did not influence the way she judged Lt. Morrison's testimony. We have recently reaffirmed that jurors may testify regarding the factual circumstances surrounding their exposure to extraneous information, but may *not* testify about whether the information influenced their verdict. V.R.E. 606(b); *Abdi*, 2012 VT 4, ¶ 17. On appeal, defendant objects to the post-trial colloquy with the juror about the effect of the exchange with Lt. Morrison on her assessment of the case. But it was defendant — not the State or the trial court — that asked the offending questions. Accordingly, the questions provide no basis for revisiting the trial court's ruling. *Peterson v. Chichester*, 157 Vt. 548, 552, 600 A.2d 1326, 1329 (1991) (explaining that a party "should not profit from acceptance of [an] invitation to

## II.

¶ 21. We next address whether the trial court improperly admitted video excerpts of defendant's uncounseled testimony in a separate RFA proceeding. After defendant's arraignment, and while he was incarcerated pending trial in this case, he appeared pro se in the family court at an RFA proceeding initiated by Ms. Wildasin. The RFA petition was predicated on the same events as the criminal charges in this case.

¶ 22. Defendant opposed the RFA petition, and the family court questioned him under oath. Before questioning defendant, the family court did not advise him of his Fifth Amendment right against self-incrimination and did not ask him whether he was represented by counsel in the related criminal proceeding. In questioning the defendant, the family court evinced some skepticism about his testimony that he was spontaneously attacked while holding a gun. For example, the family court responded to defendant's testimony by asking, "And you're saying, unprovoked, he suddenly turns on you and hits you in the bedroom?" When defendant responded in the affirmative, the court followed up, "Without provocation?" When defendant agreed, the family court continued, "And you just happened to have a gun in your shorts?" Later in the back-and-forth, the family court remarked, "Well, most people just don't walk out their front door with a gun in their shorts." In addition, the family court asked defendant, "Does your story not sound extremely farfetched?," to which he responded, "I'd agree with you that it does."

¶ 23. Before the trial, the State filed a motion notifying defendant and the court of its intent to introduce the portion of the family court transcript from the RFA hearing that included defendant's testimony. Defendant did not file an objection. Prior to the jury draw, the trial court discussed the proposed RFA testimony with counsel. Defendant did not object to the proffered evidence, and noted that, based on his anticipated cross-examination of the petitioner in that proceeding, he might request admission of the *entire* hearing transcript, not just the transcript of defendant's testimony.

¶ 24. At the beginning of the trial, the court again took up the issue of the proffered RFA hearing testimony. Defendant did not

participate in an event she now claims should never have occurred in the first place").

object to the inclusion of the testimony in general, but sought exclusion of the segments of the questioning that reflected the family court's skepticism. In particular, defense counsel stated, "The defendant's statements are fine, Your Honor. It's the judge's responses to those statements that I object to. They're prejudicial to my client. They prejudge my client." The trial court did not agree to excise from the RFA testimony all of the family court's skeptical questioning, but did agree to exclude the family court's comment that most people don't carry guns in their shorts, as well as its question about the far-fetched nature of defendant's story.

¶ 25. The court also admitted an excerpted video of the RFA testimony with the following cautionary instruction:

> Now, I think it's fair to say [that the RFA video is] being presented to you because of statements that Mr. Mead made in the course of this proceeding, but you should not draw any inferences one way or the other from the fact that this proceeding was actually being conducted and you should not be concerned with whether or not an order was issued as a result of this proceeding. As I say, it's being presented, to my knowledge and understanding to give you a — a chance to hear the statements by Mr. Mead in the course of the proceeding. So, with that in mind, we can proceed . . . .
>
> Just let me say one other word about the RFA proceeding. It's common — as a matter of fact, I would say it's even the norm, when there are no lawyers involved, for the judge to be asking the witnesses questions.

¶ 26. Defendant argues that admission of the RFA video violated his Fifth Amendment privilege against compelled self-incrimination, his right to counsel under the U.S. and Vermont Constitutions, as well as Vermont statutory law, and was unduly prejudicial. In particular, defendant argues that pursuant to state and federal constitutional protections, the family court should have advised defendant of his right against compelled self-incrimination in the family court proceeding and, insofar as the family court failed to do so, the trial court in this case was obliged to exclude the evidence of defendant's statements. Moreover, defendant argues that the family court's questioning of defendant, who was represented in the criminal proceeding, without a waiver of

counsel violated his constitutional and statutory right to counsel. Finally, defendant argues that the family court was obligated pursuant to the Public Defender Act to inform defendant of the right to counsel, and that in the absence of such notice, defendant's statements should be suppressed.

¶ 27. Because defendant makes these constitutional objections for the first time on appeal, our review is limited. See V.R.E. 103 (requiring specific bases for objection to be articulated in order to preserve error). "When an issue has been forfeited through a party's failure to raise it below . . . , we may consider it only under the rubric of plain error." *State v. Yoh*, 2006 VT 49A, ¶ 36, 180 Vt. 317, 910 A.2d 853. "[W]e will reverse based on plain error only when: (1) there was an error; (2) the error is obvious; (3) the error affects substantial rights and results in prejudice to defendant; and (4) the error seriously undermines the fairness, integrity, or public reputation of judicial proceedings." *State v. Butson*, 2008 VT 134, ¶ 15, 185 Vt. 189, 969 A.2d 89.

¶ 28. We cannot say that the claimed constitutional violations rise to the level of plain error, if there was error at all. The gravamen of defendant's constitutional arguments is that the admission of his prior uncounseled statements triggered myriad constitutional violations. But defendant's statements in the RFA hearing were almost entirely consistent with his testimony below in *this* proceeding. Although the testimony may therefore have been cumulative, it could not have substantially affected the judgment below to defendant's prejudice. For that reason, defendant cannot demonstrate that the admission of his prior uncounseled testimony in the RFA proceeding resulted in a constitutional or statutory violation that "strikes at the very heart of the defendant's constitutional rights." *Butson*, 2008 VT 134, ¶ 15 (citation omitted).

¶ 29. Defendant did object below to the admission of some portions of the family court hearing — in particular, a number of the court's more skeptical questions — on the ground of undue prejudice. Although our standard of review with respect to this challenge is very deferential, we have recognized that "a judge's lightest word or intimation is received by a jury with great deference," *State v. Camley*, 140 Vt. 483, 489, 438 A.2d 1131, 1134 (1981), and thus we acknowledge that inclusion of the family court's skeptical questions may well have given rise to undue prejudice. We do not reach the question of whether the trial court

erred in admitting the RFA hearing questioning because we conclude that any error was, in the context of the case more broadly, harmless.

¶ 30. Even if we conclude that a court erred in admitting evidence at a criminal trial, we may still uphold a conviction if we "find beyond a reasonable doubt that the jury would have returned a guilty verdict regardless of the error." *State v. Oscarson*, 2004 VT 4, ¶ 30, 176 Vt. 176, 845 A.2d 337; see also *State v. Myers*, 2011 VT 43, ¶ 16, 190 Vt. 29, 26 A.3d 9 (holding that even if court's pretrial ruling admitting evidence under Rule 403 balancing test was erroneous, any such error was harmless because erroneously admitted evidence was merely cumulative).

¶ 31. In this case, even if erroneous, admission of the RFA videotape would not require reversal because defendant's credibility as to his version of events was severely undermined by the multitude of inconsistencies effectively exposed by the prosecution's cross-examination. See *State v. Charbonneau*, 2009 VT 86, ¶ 16, 186 Vt. 583, 980 A.2d 279 (mem.) (finding erroneous admission of testimony harmless where only prejudice was that it undermined credibility of defendant's wife, whose own inconsistent statements along with other testimony "rendered her credibility negligible at best"). On its face, defendant's version of what occurred on the evening in question — he was attacked without provocation and fired his gun accidently — was not believable. The physical evidence and the testimony of all of the other witnesses supported the State's case and not defendant's version of what occurred. Defendant had no explanation for taking his gun from his car to the room where the incident occurred. Moreover, the prosecutor's cross-examination revealed that defendant had initially told police that a person in a "do rag" and pink sunglasses had taken the gun and that it was later fired when he tried to take the gun back from the alleged thief.

¶ 32. In short, the RFA evidence undermining defendant's credibility was cumulative and, even if we excised from the criminal trial defendant's statements and the judge's skeptical responses at the RFA hearing, defendant's credibility regarding his story as to what occurred on the night in question was hopelessly compromised. See *Oscarson*, 2004 VT 4, ¶ 31 ("[W]e must assess harmlessness by considering the likelihood of the conviction in the absence of the offending testimony.").

## III.

¶ 33. Defendant also asks us to reverse based on the trial court's decision to admit evidence of certain prior bad acts of defendant. Before trial, pursuant to Vermont Rule of Evidence 404(b) and Vermont Rule of Criminal Procedure 26(c), the State filed a notice of its intent to introduce evidence of prior bad acts of defendant. In particular, the State intended to introduce evidence about defendant's past relationship with Ms. Wildasin, including evidence that, when Ms. Wildasin was a high school student and was dating defendant, he informed her that he had people watching her at all times while she was at school; evidence that defendant did not allow Ms. Wildasin to make plans without his permission, forbade her from talking to her male cousin due to defendant's jealousy, and forced her to turn her paychecks over to him; evidence of past physical altercations between Ms. Wildasin and defendant, including her testimony that she had to be careful of what she said since the smallest thing could upset defendant; evidence that on one occasion when Ms. Wildasin refused to turn over their child to defendant when it was not his day to have the child, defendant got mad, grabbed Ms. Wildasin by the throat with one hand, causing her pain, and pulled her keys out of her car's ignition; evidence of a pattern between defendant and Ms. Wildasin of fighting about their mutual child, followed by a short period of amicable interactions; and testimony that defendant tried to persuade Ms. Wildasin to get back together with him the day before the incident giving rise to these charges, but that he changed his mind when she told him that if they were to date "it would not be his 'way 24/7.' " The State argued that the "prior bad act" evidence would provide context to the jury, would show defendant's motive and intent to kill Mr. Nunes, and had probative value that outweighed its prejudicial effect.

¶ 34. Defendant objected, arguing that the evidence was not relevant to the specific charge of attempted first-degree murder that was before the court, and that the prejudicial effect of the evidence substantially outweighed any probative value. The trial court ruled that the evidence was admissible under V.R.E. 404(b) to show motive and, in turn, intent, and further ruled that the probative value of the evidence greatly outweighed any prejudicial effect.

14

¶ 35. At trial, Ms. Wildasin testified, over defendant's renewed objection, to the matters disclosed in the State's pretrial notice. Among other things, Ms. Wildasin testified that when she was partnered with defendant she had to do everything defendant wanted, and she detailed specific instances to illustrate the control defendant sought to have over her life. For example, she testified:

> If I wanted to go see my mom, I had to leave at a certain time. And . . . if I stopped to get gas or something and it took longer than [defendant] expected or thought it did, I would get yelled at or get sworn at. It would turn into an argument.

Ms. Wildasin went on to describe an incident that occurred in their apartment in which defendant physically restrained her, locking windows and doors when Ms. Wildasin tried to leave. Before describing the events of the night in question, Ms. Wildasin testified that she had been sleeping with Mr. Nunes over a period of time and that defendant knew that this was going on. Defendant reiterated his objection to this testimony in a post-trial motion, and does so again on appeal.

¶ 36. We recognize the trial court's broad discretion to admit evidence of a defendant's prior bad acts, and we will reverse the trial court's decision only when we find an abuse of discretion resulting in prejudice. *State v. Longley*, 2007 VT 101, ¶ 15, 182 Vt. 452, 939 A.2d 1028.

¶ 37. In general, the Vermont Rules of Evidence preclude the admission of "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show that he acted in conformity therewith." V.R.E. 404(b). However, subject to the constraints of Rule 403, courts may admit evidence of a defendant's prior wrongs to show, among other things, motive or intent. V.R.E. 404(b); *Longley*, 2007 VT 101, ¶ 15. On this basis, we have allowed evidence of prior instances of abuse between a defendant and victim in an aggravated domestic assault trial insofar as that evidence explained the defendant's motivation, providing evidence of his intent to threaten his wife. *Longley*, 2007 VT 101, ¶ 19. In a prosecution for second-degree murder and domestic assault, we affirmed a trial court's admission of testimony about defendant's prior assaults on the victim to rebut the theory that her death was accidental, and to show the defendant's state of mind for the purpose of establishing the requisite intent for the charge of

second-degree murder. *State v. Jones*, 2008 VT 67, ¶ 15, 184 Vt. 150, 955 A.2d 1190. And in a trial for first-degree murder, we recognized that evidence that the police knew of defendant's history of abusing his wife and that he was on probation for a previous act of domestic violence was admissible under Rule 404(b) to show his motive, which was, in turn, relevant to the elements of intent and premeditation. *Yoh*, 2006 VT 49A, ¶ 18.

¶ 38. In this case, the State sought to prove that defendant fired his weapon with the intent to kill. Given defendant's own testimony that he did not deliberately fire the gun, his intent was a central issue in the case. As in the cases cited above, the trial court could reasonably conclude that the testimony at issue regarding defendant's persistent past efforts to control Ms. Wildasin, including through the use of threats and violence, shed light on his motive and intent at the time of the shooting. Especially coupled with the evidence that defendant had tried to get back together with Ms. Wildasin the night before the events in question, that he knew that Ms. Wildasin was involved in a romantic relationship with Mr. Nunes, and that shortly before the shooting Ms. Wildasin rebuffed defendant's attempt to approach her and Mr. Nunes slammed the door in defendant's face, the evidence could support the inference that defendant did not fire the gun at Mr. Nunes by accident but, rather, fired with an intent to kill. Accordingly, the trial court did not abuse its discretion in determining that the prior-bad-acts evidence of defendant was admissible for a nonprohibited purpose.

¶ 39. Even where evidence is admissible pursuant to Rule 404(b), the Vermont Rules of Evidence require that the trial court also ensure that the danger of unfair prejudice does not substantially outweigh its probative value. V.R.E. 403; *Longley*, 2007 VT 101, ¶¶ 15, 18-22. Generally, we uphold the trial court's discretionary ruling on this issue where there is some indication that the court actually engaged in the balancing test and exercised its discretion under V.R.E. 403. *Longley*, 2007 VT 101, ¶ 18. In this case, the trial court did engage in a Rule 403 balancing, describing the probative value of the evidence and concluding, "Suffice it to say that Defendant's history with Ms. Wildasin is highly probative of Defendant's motive in acting as alleged, as well as his mental state at the time. . . . [T]he probative value of the proffered evidence greatly outweighs any prejudicial effect."

¶ 40. The trial court did not abuse its discretion in assigning probative value to the evidence in question; in the decisions cited above we have repeatedly recognized that in appropriate cases evidence of a past controlling or abusive relationship can shed light on a defendant's motive or intent, or both, in connection with a particular charge stemming from events involving the object of the past abuse.

IV.

¶ 41. Finally, defendant argues that the trial court failed to instruct the jury that it must be unanimous in deciding which of the shots that defendant fired were the basis for defendant's conviction. Defendant did not raise this issue below, so we review only for plain error. *State v. Doleszny*, 2004 VT 9, ¶ 10, 176 Vt. 203, 844 A.2d 773.

¶ 42. We find that the argument lacks merit, and certainly does not rise to the level of plain error. As a general rule, when evidence at trial reflects two or more criminal acts, but defendant is charged with only one such act, the State must identify the act that it invokes as the basis for conviction to avoid the risk that certain jury members will base a conviction on one act, while others base it on another, thereby defeating the unanimity of the jury's verdict. *State v. Zele*, 168 Vt. 154, 158, 716 A.2d 833, 836 (1998).

¶ 43. However, no such election is required when "numerous acts are so related as to constitute a single transaction or offense." *Id.* at 158, 716 A.2d at 836-37 (State not required to elect an individual cache of marijuana on which to base its case); see, e.g., *State v. Bailey*, 144 Vt. 86, 98, 475 A.2d 1045, 1052 (1984) (where defendant committed repeated sexual assaults upon a single victim over a period of one and one half hours, State was not required to elect single act upon which to base conviction) (abrogated on other grounds by *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)).

¶ 44. In this case, defendant fired the various shots within a span of minutes, if not seconds. The shots were all part of a continuous course of events that began when he pointed his gun at Mr. Nunes's face and ended when he fled the scene. On this record, the trial court's instructions, which did not call upon the

jury to identify the specific shot that supported its conviction, did not amount to plain error.

*Affirmed.*

¶ 45. **Skoglund, J.,** concurring. I concur with the majority's opinion in all respects except I would hold definitively that the trial court abused its discretion in admitting the videotape of the relief-from-abuse (RFA) hearing. As the majority points out, the RFA petition was predicated on the same events that formed the basis for the State's attempted murder charge, and the RFA hearing took place after defendant was arraigned and assigned counsel in the criminal case. Nevertheless, defendant participated in the RFA hearing without counsel, and the family division judge did not forewarn him that his testimony at that hearing could be used against him in the upcoming criminal trial. At the RFA hearing, the family division judge expressed unabashed incredulity in questioning defendant about his version of the events that led to the attempted murder charge. In my view, the danger of undue prejudice that necessarily results from allowing a jury to hear another judge expressing skepticism as to the defendant's credibility overwhelms any potential probative value in having the jury hear such remarks. Given the circumstances of this case, including the fact that the State's original proffer for allowing admission of the videotape was negated by the trial court's limitation on what the jury could hear, the trial court should have denied the State's request that the jury hear the RFA videotape. Accordingly, although I concur with the majority's mandate and its conclusion that admission of the videotape was harmless, I write separately to express my belief that admission of the videotape was error.

¶ 46. In its pretrial motion in limine, the State sought admission of defendant's statements during the RFA hearing "as admissions by party-opponent under V.R.E. 801(d)(2)." As the State explained on the first day of trial, it wanted the jury to hear, "as an admission by the defendant," that defendant had agreed with the family division judge's assessment of his version of events as "far-fetched." Ironically, the trial court ultimately ruled that the jury would not be allowed to hear the judge's "far-fetched" query or defendant's response to that query, and yet nearly the entire remainder of the RFA videotape was played to the jury, over defense counsel's objection, without any further proffer from the State. In objecting to admission of the videotape, defense counsel

repeatedly reiterated that defendant's statements were fine, but that the family division judge's skeptical responses and queries concerning defendant's version of events were unduly prejudicial to defendant.

¶ 47. There can be little doubt why defense counsel did not want the jury in defendant's criminal trial to hear another judge express incredulity in response to the very same story defendant was to present to that jury. As the majority recognizes, "defendant's statements in the RFA hearing were almost entirely consistent with his testimony below in *this* proceeding." *Ante,* ¶ 28. In response to the same story, the jury heard the RFA judge skeptically ask defendant, "[S]o your good friend there suddenly turns on you and hits you?," "And you're saying, unprovoked,· he suddenly turns on you and hits you in the bedroom?," "Without provocation?," "And you just happened to have a gun in your shorts?," and "Well, then if it's totally neither of those most popular categories [drug or girlfriend related], what else could it be?"

¶ 48. As the majority states, this Court has forewarned that "a judge's lightest word or intimation is received by a jury with great deference." *State v. Camley,* 140 Vt. 483, 489, 438 A.2d 1131, 1134 (1981). Here, the judge's incredulous queries far exceeded mere intimation as to defendant's lack of credibility. Worse, once the trial court removed defendant's affirmation of his version of events as "far-fetched," the only purpose for admitting the RFA videotape was to allow the jury to hear the RFA judge's expressions of disbelief upon hearing defendant's version of what took place on the night in question. Notably, the videotape was admitted and played to the jury before defendant even testified; thus, this was not a situation where defendant's prior statements were admitted for purposes of impeachment or rebuttal. Under such circumstances, the trial court plainly erred in allowing the jury to hear the RFA judge's comments and queries expressing skepticism as to a defendant's credibility on matters that formed the basis for the charges in his criminal trial.

¶ 49. I agree with the majority that defendant has failed to demonstrate plain error with respect to his constitutional claims. In any case, there are questions as to the application of the constitutional rights to counsel and against compelled self-incrimination in this civil RFA proceeding. But even assuming that these constitutional rights do not apply in this particular situation,

the fact that defendant was participating without his assigned counsel from the criminal case and was not warned of the potential use of statements he might make concerning events that formed the basis of pending criminal charges should weigh heavily in not admitting the RFA videotape in the later criminal trial. See *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973) (stating that Fifth Amendment right against self-incrimination protects individuals from having to answer official questions put to them not only in criminal prosecutions, but "in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings"); cf. *State v. Begins*, 147 Vt. 295, 299-300, 514 A.2d 719, 723 (1986) (holding that probationer must be advised that his testimony at probation revocation hearing held before disposition of criminal charges arising from probation violation is inadmissible during later related criminal proceedings except for purposes of impeachment or rebuttal).

¶ 50. The admission at defendant's trial of the RFA judge's skeptical colloquy with defendant struck at the heart of defendant's defense. Most assuredly, defendant's version of events raised difficult questions regarding his defense, but it cannot be acceptable for the trial court to allow the prosecution to highlight those difficulties by presenting skeptical questions from a judge in another proceeding — particularly when the prior statements are not being admitted for purposes of impeachment or rebuttal. Apparently, that is exactly what the prosecution intended here, and the trial court abused its discretion by allowing it because the danger of unfair prejudice substantially outweighed any potential probative value. See V.R.E. 403 (allowing relevant evidence to be excluded where danger of unfair prejudice outweighs probative value).

¶ 51. In short, I write separately to emphasize that, under no circumstances, at least certainly not those present here, should a criminal trial court admit testimony in which another judge expresses skepticism regarding the defendant's version of events that form the basis for the criminal charges.

¶ 52. I am authorized to state that Justice Dooley joins in this concurrence.