NOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2019 VT 33

No. 2017-424

| State of Vermont | Supreme Court |
| --- | --- |
| | On Appeal from |
| v. | Superior Court, Washington Unit, Criminal Division |
| Jody Herring | February Term, 2019 |

John L. Pacht, J.

Thomas J. Donovan, Jr., Attorney General, Benjamin D. Battles, Solicitor General, and
  Eleanor L.P. Spottswood, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

Matthew Valerio, Defender General, and Joshua O'Hara, Appellate Defender, Montpelier,
  for Defendant-Appellant.

PRESENT:  Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.

¶ 1.     **ROBINSON, J.**   Defendant Jody Herring, who pleaded guilty to murdering her cousins Rhonda and Regina Herring, her aunt Julie Falzarano, and social worker Lara Sobel, challenges her sentence of life imprisonment without possibility of parole for Lara Sobel's murder. She argues the trial court abused its discretion in holding her history of trauma and resulting anxiety disorder against her when it should have viewed them as mitigating factors, and in basing its decision on a mistaken understanding that, if given an indeterminate sentence, she might be paroled without having rehabilitated.  We affirm.

¶ 2.     Defendant and the State entered into a plea agreement in which defendant pleaded guilty to the second-degree murders of her cousins and aunt and the first-degree murder of Lara

Sobel. As part of that agreement, defendant admitted the following. On the morning of August 7, 2015, she called the home of her cousins and her aunt. Rhonda Herring answered, and defendant told her "they better stop calling" the Department for Children and Families (DCF) or they would be "fucking sorry." That afternoon, defendant went to their home armed with a rifle. She entered the house and intentionally shot and killed her cousins Rhonda and Regina Herring and aunt Julie Falzarano. She called her brother Dwayne Herring several times and left two messages. One said, "If you think anything of your sister, you'll get a hold of me now" or words to that effect. The next said, "Watch the news—you'll wish you got a hold of me earlier." After that, defendant parked her car behind the building where she knew the DCF office was located. She waited until she saw Lara Sobel exit the building. Lara Sobel was a DCF employee who, in her professional capacity, had been working with defendant. Defendant approached and intentionally shot her. Defendant then dropped the rifle. She did not resist arrest.

¶ 3. As part of the plea agreement, defendant agreed that the State could seek concurrent sentences of twenty years to life for the murders of her cousins and aunt. Defendant and the State did not come to an agreement as to the sentence for Lara Sobel's murder, although they agreed that each party could argue for any lawful sentence, including a sentence of life imprisonment without parole; the State sought a sentence of life without parole, consecutive to the other sentences.

¶ 4. The court held a three-day sentencing hearing. The evidence at the sentencing hearing reflected the following. Defendant has experienced many forms of trauma throughout her life. Her father died when she was a child. Defendant, like others in her family, believes her father was murdered, and she was very upset that his death was pronounced a suicide. Defendant's mother and stepfather physically abused her. Defendant's brother Dwayne testified that when he was thirteen and defendant was ten or eleven their mother kicked them out of the house (defendant's aunt testified defendant was fourteen; another aunt said defendant was eleven or

2

twelve when this happened). After that, defendant and Dwayne lived together in abandoned cars and with their grandparents. When defendant was seventeen, she was raped and became pregnant with her first child. As an adult, defendant has been in a series of physically and emotionally abusive relationships. She lost custody of her first three children; in at least one case, her parental rights were terminated because of substance abuse.

¶ 5. In October 2014, defendant became unemployed and she and her youngest daughter, with whom she was living at the time, became homeless. In late 2015, the daughter's school counselor, who was aware defendant was homeless and had been trying to connect defendant to resources, grew concerned that defendant "was becoming a little less coherent and hard to follow." The school principal contacted DCF in January 2015 because defendant seemed very anxious and would go off-topic when speaking, and the principal felt she might pose a risk of harm to the child. When defendant discovered the principal had called DCF, she became very angry. The principal told her she had called DCF to help defendant get resources. Defendant told the principal she did not want her help. DCF placed her child into the child's father's conditional custody in late January of 2015.

¶ 6. After defendant lost custody of her daughter, her brother Dwayne testified that "she was losing it. It messed her up." Henry Premont, who was in a relationship with defendant at the time, testified that defendant said she wanted to shoot people in the head and watch the "brain matter splatter," and that she said, "People are going to pay, there's going to be an Armageddon." He testified that some of those statements may have been directed at DCF. He also said defendant showed him a handwritten "hit list" that included the names of Regina and Rhonda Herring. In March, defendant tried to purchase firearms from two different gun stores, but each time was denied after the store ran a background check on her.

¶ 7. In May 2015, defendant was temporarily involuntarily hospitalized after she overdosed on pills. Defendant had called her cousin and, according to the cousin, said to tell her

3

daughter "why she doesn't have a mother anymore." The cousin called emergency services, and emergency responders forced their way into defendant's home. They found her in bed, surrounded by empty pill bottles and pictures of her children. She was involuntarily committed. While hospitalized, defendant was initially combative and refused treatment, but gradually became more receptive to at least discussing future treatment. She repeatedly requested that she be released, and at the end of May she was discharged.

¶ 8. In late July or early August of 2015, Henry told Dwayne that he had bought a pistol to give to defendant. Dwayne told Henry not to give defendant a gun and said he was a "damned fool" for even considering it. The rifle defendant ultimately used in the shooting was Henry's, taken without his permission.

¶ 9. Hours before the murders, defendant left a message on Rhonda's answering machine. Tiffany Herring, Rhonda's daughter, heard the message and she testified that in it, defendant was screaming and saying something to the effect of "Rhonda, Regina, you might want to stop fucking calling DCF or I'm going to come and shoot your brains out." After hearing the message, Tiffany left the house to go see a friend.

¶ 10. When Tiffany came home, she found her mother and grandmother on the first floor, shot dead. She called 911. When the police came, they found her aunt upstairs, also shot dead.

¶ 11. Witnesses to Lara Sobel's death also testified. One said that beforehand, defendant had sat in her car, screaming. When Lara Sobel came out of the building, another witness reported that defendant, holding a rifle, yelled, "You know what you did," then raised the rifle and shot her, then two or three seconds later, after she had fallen to the ground, shot her again. A witness reported that defendant then began "jumping around the parking lot swinging the rifle around," saying, "They didn't listen to me. It was my nine-year-old daughter. They got what they deserved." Defendant then laid down the gun, and a bystander took it and removed the

4

ammunition. Another bystander took hold of defendant's arm. Defendant then waited calmly as police officers arrived, handcuffed her, and put her in a police vehicle.

¶ 12. An officer reported that once in custody, defendant was calm and laughing. Later, when officers questioned defendant, she said, "They fucking deserved it."

¶ 13. Dr. Renee Sorrentino, a forensic psychiatrist who testified for the defense, said that after interviewing defendant and reviewing her medical records, she had diagnosed defendant with a severe anxiety disorder. She explained that this "fueled her general suspicion of others in the months preceding the incident offenses." Dr. Sorrentino noted that in 2015, after she first assessed defendant, she had initially believed that defendant was experiencing "symptoms of suspiciousness and persecution [that] rose to the level of paranoid ideation and delusions." She later came to believe, however, that these symptoms were linked to defendant's anxiety disorder, and that defendant's suspicions—including that her father had been murdered and that her older daughter and ex-partner were following her—were "in part based in reality." Dr. Sorrentino qualified this by saying that "Although based in reality, [defendant's] perception[] of these various wrongdoings was quite extreme."

¶ 14. Dr. Sorrentino concluded that it was her "opinion with reasonable medical certainty that the totality of [defendant's] childhood trauma, her repeated exposure to psychosocial stressors, her active symptoms of anxiety, as well as her active symptoms of substance use impaired [her] perception on the day of the incident offenses." She explained that defendant's anxiety impairs her ability to manage her emotions, and when her anxiety became intense, one of its manifestations was rage.

¶ 15. Dr. Thomas Powell, a forensic psychologist who had done a psychological assessment of defendant, also testified for the defense. He said that the effects of the type of trauma defendant described experiencing are serious and can last for decades. He added, however, that "I would never say the trauma causes something like" the murders defendant committed.

5

¶ 16. Dr. Powell said that "having a therapeutic relationship for [defendant] will be a challenge" because "trust is a huge issue for her and to allow somebody to enter into what we think of as a meaningful therapeutic relationship, particularly with her trauma history, is going to be a long-term enterprise that is going to have ups and downs." When asked to quantify "long-term," Dr. Powell responded that "we'll be measuring this in years, not in months," and added that while defendant had begun to build trust with some of the staff members in the correctional facility, "therapy's different." He said it was difficult to evaluate whether defendant would comply with treatment, because "the correct therapist . . . could probably engage her pretty well. I don't [know] whether she would act out or not, but she might. It could be a—a way of avoiding having to deal with very painful issues that she's carrying with her." If she found "the wrong therapist," he continued, "[t]hat would not be good." When asked if he could testify with any certainty as to whether defendant's trauma could be sufficiently treated such that she would no longer pose a risk to the public, he said he could not.

¶ 17. A number of people also submitted victim-impact statements. Lara Sobel's parents, sister, and close friend and many of Rhonda and Regina Herring and Julie Falzarano's family members spoke of the devastating losses of their loved ones, and of the impact those losses would have for the rest of their lives. A representative of DCF described how traumatic it had been for DCF staff to endure both losing a friend and coworker and facing increased threats toward social workers in the wake of the murder, with people invoking Lara Sobel's name in their threats to DCF staff.

¶ 18. Finally, defendant gave an allocution. She said, "I'm very sorry. I can't take back that day. I wish I could, but I can't. I handle my stress so differently than anybody else does, and I wish I could help myself. I really could." She then continued, "I asked for help several times, and I didn't get it." She asked why her daughter's principal had not helped her, and said she wished she was still in the hospital where she had been that spring, "because this would've never happened."

6

¶ 19.    In its sentencing remarks, the trial court held that the nature and circumstances of the crime were "devastating," noting there have been no crimes "of greater magnitude that I am aware of in this state."  It said:

> No one can deny that the crimes are equal . . . to anything that this State has had.  There were four murders.  They were well planned. They're lying in wait, and they had been thought out for some time . . . .  Jody's family was all in their home sometime in the afternoon on August 7th, 2015, and they were just mowed down.  That's the only way to put it.  Apparently, first Rhonda, then Julie Ann, and . . . Regina last, having to endure knowing what was coming.  And then Lara . . . .  I'm not going to repeat the facts of what happened then. We know what happened.  We know how devastating it was.  We know it was essentially an assassination.  Now, Jody didn't intend to get away.  She had made a decision and she says it later, "If I have to go to jail for the rest of my life, it was worth it."  She had a clear consciousness of what she was doing, and apparently feeling that she had nothing left to lose. As noted, what it did to her community, what it did to [] DCF services, what it did to the criminal-justice system, it's had ripple effects that are well-documented, the killing of Lara Sobel, and how everyone goes about doing their jobs, and the ability to keep children safe.

¶ 20.    The court acknowledged that defendant's history and characteristics presented "a complicated situation."  The court "recognize[d] that the trauma for a five-year-old child of having her father killed and then having those unanswered questions is very powerful," and it recognized that she had endured domestic abuse.  It found defendant "had an anxiety disorder, and . . . the effects of her childhood played a role in her ability mainly to trust others.  And that inability to trust others, combined with what appears . . . from the record [to be] a need to blame others for things that were more complicated . . . is sadly a piece of this."  It found this was reflected in the DCF proceedings: Defendant "wasn't able to trust in those who, frankly, I think were trying to help her."  The court noted Dr. Sorrentino's testimony that defendant "may not have paranoid delusions, but she has paranoid ideation and it exacerbates her natural anxiety.  And I think that has played a very significant part in her inability to see how she might be able to help herself." Finally, the court emphasized that in "the last month, whatever the anxiety was, it seemed the

overriding emotion was rage," and while anxiety played some role, "on August 7th, she was in a state of rage, and the comments thereafter are consistent with still being in that state of rage. And at least at that time, it's absolutely clear what she wanted to do and why she wanted to do it."

¶ 21. Regarding defendant's need for treatment, the court held that "certainly she needs treatment; whether she's ever amenable to treatment is unclear." It noted defendant has "a resistance to treatment including inability to get engaged with authority. And whether that's born out of an understandable reason or not, it makes it very hard to get better and results in these bits of rage and anxiety."

¶ 22. As to public protection, the court reflected that defendant's "feeling that the system, frankly, has been incredibly unfair" to her and that she was "the victim here, and that to then spend the next number of years in jail feeling that way without treatment" made her "a great risk to public safety." It added that "I think the very disorders that have been spoken to actually increase the risk, and I didn't hear a lot about how that risk would be addressed."

¶ 23. Finally, the court held there was a unique need for general deterrence in this case because defendant's actions had inspired people to "lash out more" at DCF workers, and "it is important that the sentence reveal that seriousness."

¶ 24. The court concluded, "I have a great deal of compassion and understanding for Jody Herring, but I also have an obligation to assure that this community is safe, that people can start to heal, and that the enormity of the crimes are reflected in the sentence." The court imposed concurrent sentences of twenty years to life each for the respective murders of defendant's cousins and aunt. The court sentenced defendant to life imprisonment without the possibility of parole for murdering Lara Sobel.

¶ 25. Defendant argues on appeal that the trial court abused its discretion in sentencing her (1) by "blaming" her for her history of trauma and resulting anxiety disorder, when it should have viewed them as mitigating factors, and (2) because its decision to sentence her to life

8

imprisonment without possibility of parole, instead of a maximum of life in prison and minimum of thirty-five years, was based on an erroneous understanding of Vermont parole law.

¶ 26. The State argues that defendant did not adequately preserve these objections for appeal, and thus they should be reviewed only for plain error. We need not decide whether the challenges to the sentence were properly preserved because we find no error, let alone plain error.

¶ 27. This court reviews a sentencing decision for abuse of discretion and the underlying factual findings for clear error. State v. Charland, 2011 VT 107, ¶ 13, 190 Vt. 389, 35 A.3d 124. In determining what sentence to impose, the trial court must consider the "nature and circumstances of the crime, the history and character of the defendant, the need for treatment, and the risk to self, others, and the community at large presented by the defendant." 13 V.S.A. § 7030(a). It "should ground its decision on legitimate goals of criminal justice, including such purposes as punishment, prevention, rehabilitation, and deterrence." State v. Allen, 2010 VT 47, ¶ 14, 188 Vt. 559, 1 A.3d 1003 (mem.) (quotation omitted). Where a court has followed these directives, its decision will stand "so long as the sentence is within the statutory limits and was not based on improper or inaccurate information." State v. Lumumba, 2014 VT 85, ¶ 22, 197 Vt. 315, 104 A.3d 627 (quotation omitted).[*]

¶ 28. Defendant first contends that the court abused its discretion in holding that her history of trauma, resulting anxiety disorder, and possible resistance to treatment made her a risk to public safety, as this punished her "for having difficult symptoms to treat" and "stands at odds with this Court's recognition that emotional trauma which compromises a defendant in a way that contributes to her crime should be considered mitigating evidence" and should be understood to reduce her culpability.

---

[*] The parties stated in the plea agreement, and do not dispute on appeal, that life imprisonment without possibility of parole is within the statutory range for first-degree murder. See 13 V.S.A. § 2303(a)(1)(B).

¶ 29. We find no error. The court's sentencing remarks suggest that it did view defendant's history of trauma, and resulting anxiety disorder, as mitigating circumstances. However, while defendant argues that her mental condition at the time of the murders diminished her culpability and thus militated in favor of a lesser sentence, the court found that her anxiety was not the primary cause of her crimes—a finding supported by evidence—and thus did not abuse its discretion when it did not find her anxiety lessened her culpability. Finally, to the extent that the court took defendant's anxiety-related mistrust of others—and the resulting likelihood that she might resist treatment—into account in sentencing her to life imprisonment without parole, this was a legitimate consideration because of its link to the prospective safety of the community.

¶ 30. Contrary to defendant's assertion that the court held her history of trauma against her, the court appeared to view the abuses she has endured throughout her life, and her resulting mental-health conditions, as mitigating circumstances. It discussed the childhood trauma she experienced, including abuse, the death of her father, and the unanswered questions accompanying his death. It reflected that this case illustrates the effect of adverse childhood experiences, and the need "to develop better and better therapies to reach people, because it's very hard . . . . [W]e always have to ask ourselves how we can be better listeners, and ask the right questions because people who have been exposed to trauma at an early life[stage] have very difficult times often with authority." It discussed how defendant's childhood had affected her ability to trust others, and how this inability to trust others "is sadly a piece of this." It reflected that, when her daughter's school and DCF became concerned about defendant's mental health, defendant was not "able to get over whatever problems she had to be able to meet with DCF or . . . do anything to just gain any support, because that fundamental trust had been broken for whatever reason." It concluded that "she wasn't able to trust in those who, frankly, I think were trying to help her," and her paranoid ideation "played a very significant part in her inability to see how she might be able to help herself." These remarks demonstrate an understanding that defendant's childhood trauma

10

contributed to her present anxiety disorder, and that this anxiety and accompanying reluctance to trust prevented others from helping defendant and defendant from helping herself—contributing to what the court called her "unraveling" in the year leading up to the murders. While the court did not explicitly say it considered these to be mitigating factors, it emphasized that it had "a great deal of compassion and understanding" for defendant, and these comments reflect that.

¶ 31. Next, while defendant argues that her trauma-induced mental-health condition diminished her culpability and warranted a lower sentence, the court's sentencing remarks reflect a finding—which is supported by evidence—that it was not anxiety but rather rage that primarily motivated defendant, and this in turn reflects a reasonable judgment by the court that defendant was not so impaired as to justify a lesser sentence. The court emphasized that it had heard evidence about defendant's "extreme or severe anxiety and that it was becoming more severe." It said, "What I'm unconvinced about is the last month, because the last month whatever the anxiety was, it seemed the overriding emotion was rage. I didn't hear anything—anxiety is either fear, real or imagined, fears of things that have happened or anxiety which is—has to do with fear of things to come. I don't know, I didn't hear that much of those things, although I know they played a piece in it." It concluded, "I did hear a lot of rageful comments. And clearly on August 7th, she was in a state of rage, and the comments thereafter are consistent with still being in that state of rage. And at least at that time, it's absolutely clear what she wanted to do and why she wanted to do it." In these final remarks, the court indicated that while there may have been a link between them, her anxiety did not itself cause defendant to commit the murders: rage did. While Dr. Sorrentino testified that defendant's perceptions and emotional management were impaired on the day of the murders, the court's finding that defendant's decision to murder four people was not a manifestation of her mental illness but rather was motivated by rage is supported by evidence— including by Dr. Powell's statement that he "would never say the trauma [defendant experienced] causes something like" these murders. This finding was not clearly erroneous. State v. Butson,

11

2008 VT 134, ¶ 26, 185 Vt. 189, 969 A.2d 89 (holding weighing evidence, including expert testimony, is "squarely within the trial court's discretion").  The court did not fail to give due consideration to defendant's mental-health condition at the time she committed the murders.

¶ 32.  Finally, the court legitimately considered the risk to public safety defendant might pose in the future, even though this risk was rooted in defendant's history of trauma and resulting mental-health challenges.  The court was statutorily required to consider the risk to others and the community at large that defendant poses, 13 V.S.A. § 7030(a), and it "is free to consider the prospect of rehabilitation, and the safety of the community, in fashioning the sentence."  State v. Loveland, 165 Vt. 418, 425, 684 A.2d 272, 277 (1996).  In its discussion of the public-protection sentencing factor, the court said it was "not sure how, without substantial treatment, this . . . feeling that the system, frankly, has been incredibly unfair to you, that you are the victim here," could be addressed, "and that to then spend the next number of years in jail feeling that way without treatment, I think makes you a great risk to public safety."  It added, "I think the very disorders that have been spoken to actually increase the risk, and I didn't hear a lot about how that risk would be addressed."  Particularly given the testimony of defendant's expert, Dr. Powell, that he could not say with any certainty that defendant could ever be sufficiently treated such that she would no longer pose a risk to the public, and that even if she found the right therapist, she might "act out" as "a way of avoiding having to deal with very painful issues that she's carrying with her," we cannot say the court erred in finding defendant would continue to be a risk to public safety.  The court was well within its discretion to consider this factor in sentencing defendant.

¶ 33.  Defendant next contends that the court abused its discretion by erroneously concluding she would be released without having rehabilitated if given a sentence that included possibility of parole.  She points to the trial court's remark that she was "a great risk to public safety" and that the court "didn't hear a lot about how that risk would be addressed."  She argues that the parole process would ensure that she would not be eligible for release if she still posed a

12

risk to the public, and thus the court's decision to sentence her to life imprisonment without possibility of parole so that she would not be released without having rehabilitated was premised on a mistaken understanding of the parole process.

¶ 34. We reject defendant's inference that the court's decision to sentence her to life imprisonment without parole was based on a misunderstanding of the parole system. The court is not required to defer any consideration of public safety to a future parole board. Moreover, the court was clear in explaining that its primary reason for sentencing defendant to life without the possibility of parole was to ensure that the sentence reflected the magnitude of the crime.

¶ 35. Defendant's argument rests on the incorrect premise that the sentencing court cannot consider the public-safety impact of a convicted offender's potential future release because, short of the maximum sentence, a parole board must determine that "there is a reasonable probability that the inmate can be released without detriment to the community or to the inmate" and "the inmate is willing and capable of fulfilling the obligations of a law-abiding citizen." 28 V.S.A. § 502a(b)(2), (3). It is true that if the court had sentenced defendant to a minimum of thirty-five years (or more) and a maximum of life imprisonment—the alternate sentence available to the sentencing court—the parole board would ultimately have to review and approve defendant's release after she reached the minimum term of her sentence. 28 V.S.A. § 501(2). Given its broad discretion to craft an individualized sentence, a court may fashion a sentence that defers to the parole-review process to address public-safety concerns. However, it is not precluded from including its own assessment of public-safety risk in the sentencing decision. State v. Sullivan, 2018 VT 112, ¶ 8, __ Vt. __, 200 A.3d 670 ("In keeping with the court's role in fashioning an appropriate, individualized sentence, the court's discretion in sentencing is broad.").

¶ 36. Moreover, we do not understand the court to have based its sentencing decision on a fear that if released on parole decades in the future, defendant would pose a threat to public safety. The court repeatedly emphasized the nature of the crime, and the effects it had on the

victims' families and friends, and on the safety and well-being of DCF workers, and said it felt "an obligation to assure that . . . the enormity of the crimes are reflected in the sentence." Moreover, the court noted the notoriety of the crime and the importance of general deterrence as a sentencing factor. While the court's finding that defendant would continue to pose a risk appears to have played some role in its decision to sentence her to life without parole, the court made clear that it was imposing this sentence because of the devastating crime defendant committed and the toll it took on so many people. This was within its discretion. State v. Webster, 2017 VT 98, ¶ 46, 206 Vt. 178, 179 A.3d 149 (holding sentence of over forty years to life was within court's discretion because of serious nature of crime—defendant shot innocent person out of rage). The court's decision does not reflect that it chose this sentence because it misunderstood the parole system.

Affirmed.

FOR THE COURT:

Associate Justice